397 A.2d 1192

**COMMONWEALTH of Pennsylvania ex rel. Ray K. DRUM, Appellant,**

v.

**Gwenn B. DRUM.**

Superior Court of Pennsylvania.

Argued March 15, 1978.

Decided Feb. 8, 1979.

Henry O. Heiser, III, Gettysburg, for appellant.

S. M. Raffensperger, Gettysburg, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

VAN der VOORT, Judge:

This is an appeal by a husband-father from an Order of the lower court providing limitations on his rights to visitations with his three children. The appellant contests that part of the lower court order which provided that when he had temporary custody of his children such visitations should be without the presence of the appellant's female companion.

At the time of proceedings in the lower court and argument before our Court, the appellant was still married to the appellee, the mother of the children. A divorce action brought by the appellant was pending. The children were aged thirteen, eleven and eight. In his brief to our Court, the appellant states an intention to marry the female companion whose presence was prohibited during periods of visitation.

Our scope of review in custody cases is quite broad. *Commonwealth ex rel. Morales v. Morales*, 222 Pa.Super. 373, 375, 294 A.2d 782, 783 (1972). While we will not nullify the fact-finding function of the hearing judge, we are not bound by deductions or inferences made by the lower court from the facts found. *Commonwealth ex rel. Ulmer v. Ulmer*, 231 Pa.Super. 144, 147, 331 A.2d 665, 667 (1974). In

all cases, the prevailing consideration is the best interests and welfare of the children involved. *Gunter v. Gunter*, 240 Pa.Super. 382, 361 A.2d 307 (1976). From our thorough review of the record in the instant case, we are convinced that the lower court did not commit error in establishing the conditions upon custody about which the appealing father complains.

 It is well established that a parent may not be denied custody or even visitation solely because of an involvement in a meretricious relationship. *Commonwealth ex rel. Myers v. Myers*, 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Sorace v. Sorace*, 236 Pa.Super. 42, 344 A.2d 553 (1975); and *Fernald v. Fernald*, 224 Pa.Super. 93, 302 A.2d 470 (1973). Here we are not faced with a denial of visitations by a father, but merely a condition placed upon such visitations, at the mother's request. In our review, we find particularly persuasive the following discussion in the opinion of the lower court:

"This is not the first case where such a request has been made of us and we have, on a few occasions, imposed similar conditions upon visitation. In other cases we have denied the request because we felt that the request was motivated more by resentment on the part of the mother than by concern for the welfare of the children. In the case now before us, however, we perceive the situation as being somewhat different because here the mother's concern is something which does bear considerably upon the welfare of the children. Here we have a mother concerned about how her children are going to react to visitations with their father who is still married to their mother but having a close association with another woman in the light of what they have been taught at home and in church regarding such relationships. We do not think that the courts can say with any degree of certainty that such experiences will not adversely affect the children. Even if the children tell us now that it makes no difference to them, we wonder if it is fair to rely upon the judgment of the children in such matters. It is only

recently that we have begun to scratch the surface of the long-range traumatic effects upon our children of what happens to them mentally and emotionally during custody disputes and the ultimate dissolution of the marriage of their parents. One thing is certain—there is nothing in the evidence of this case or of any other that says that such relationships *enhance* the welfare of the children. "Moreover, it seems vital to us that the purpose of visitation for the father is to continue or to stabilize the relationship between the father and his children, and we do not think it is unreasonable for him to set aside his own romantic interests during the period of time while he is still married to the children's mother for the period of time when he has the children with him. In our interviews with the children we tried to determine whether the father's relationship with his girl friend in any way detracts from his attention to his children during their visitations with him. The oldest child was the most responsive. She indicated that her father wouldn't take her out on her last birthday because his girl friend could not be present . . . Interestingly enough, the youngest child was aware of the problem and even she knew that this was wrong . . .

"Under all of the circumstances of this case, we are of the opinion that the condition we have imposed upon the father's visitation with his children is not unreasonable and that their best welfare will be promoted if the condition is imposed at least until the time when the marriage between the father and mother has been legally resolved (sic)."

We find the condition imposed by the lower court to be reasonable and proper in the circumstances of this case, and further, find that it would serve the best interests of the children. Clearly, the trial court's conclusion, in that regard, is supported by ample evidence of record.

The dissent, in suggesting a remand, relies principally upon the conclusion that the appellee mother was motivated "in large part" by feelings of resentment in seeking the

condition upon visitation which the lower court imposed. Curiously, the dissent goes on to state: "Not that the mother is to be blamed; quite to the contrary, it would be astonishing if she were not resentful of someone who, while purportedly her best friend, has, as she must see it, stolen her husband and destroyed her family." While the issue of the mother's motivation is essentially irrelevant to the question of what is in the best interests of the children, it should be noted that the lower court specifically found as a fact that the appellee's request was not motivated by resentment. This finding also has ample support in the record. The dissent also notes that there is no evidence to suggest that the father's female companion represents any threat to the children's welfare. This is simply not true, since the record is replete with references to the religious teachings instilled in the children by their parents, which would certainly run contrary to a situation in which their father, while married to their mother, instead keeps the company of another woman. This discussion is not meant to imply a castigation of the appellant's morals or personal life, but merely to illustrate evidence of record, indicating circumstances which would not be in the best interests of the children, and can reasonably be avoided by the condition imposed.

Affirmed.

SPAETH, J., files a dissenting opinion.

JACOBS, former President Judge and HOFFMAN, J., did not participate in the consideration or decision of this case.

SPAETH, Judge, dissenting:

I think we should remand for further proceedings. To say why, I must state the facts rather more fully than has the majority.

The parties are in their forties, and have three children— Alison, a girl, born in 1964; Trevor, a boy, born in 1966; and Jessica, born in 1969. Early in May 1975 the father separated from his family, and later that month sued for divorce, in

an adjoining county. By agreement, the children remained with the mother.

The children visited their father, but before long a difficulty arose: the mother told the father he could have the children only on condition that one Alice Guise was not present. The father objected to this condition and in October 1976 filed a petition asking the lower court to grant him visitation according to a certain proposed schedule. The mother filed an answer; although the answer objected to some aspects of the proposed schedule, its principal point was that the court should allow visitation only on condition that

> [t]he [father's] girlfriend, Alice Guise, will not be permitted to be present during any of the visitations until such time as a final decree in divorce is entered in the divorce case instituted by the [father].

Answer, para. 4(c)(3), Record at 6a.

The lower court heard testimony in December 1976. At the conclusion of the hearing the court dictated a temporary visitation order; generally, the order allowed visitation on alternate weekends and on certain holidays and during the summer. The court then stated that pending further argument, "we are also going to grant the prayer of the [mother] that the visitations occur outside of the company of Mrs. Guise." Record at 123a. On November 2, 1977, after hearing arguments, the court made its temporary order final. It is this final order from which the father has appealed.

The evidence before the lower court comprised, on the husband's part, the testimony of the husband, Alice Guise, Bernard Yannetti, who is a friend of the husband, and John MacDowell, who is minister of the church attended by the husband and Ms. Guise, and on the mother's part, her testimony. In addition, the court questioned the three children. The evidence disclosed the following facts.

Alice Guise is highly educated, with a Ph.D., and the mother of five boys, whose approximate ages are 19, 17 (twins), 13, and 11. Ms. Guise was the mother's best friend, and has known the parties' three children since their birth;

the children call her Aunt Alice, and Trevor regards Clay Guise—one of Ms. Guise's youngest boys—as one of his best friends. Ms. Guise was divorced in August 1975. She and the father are in love and intend to get married as soon as the father is divorced. They are open in their relationship— for example, they attended a football game in which one of Ms. Guise's boys was playing—but they are not living together.

One particular reason the father wishes to be allowed to visit his children with Ms. Guise present is that Trevor and Clay Guise play together. More generally, he described his reason, as follows:

Q. Have you and Mrs. Guise engaged in any immoral conduct or anything of that sort in front of the children?

A. No.

Q. To your knowledge, based upon your observations as a father to your children, has it bothered your children or had any kind of effect upon them; they have had occasion to see you with Mrs. Guise when you had them in your custody?

A. It's a normal healthy relationship that we would want to have, they know that I want to get married to Alice, they know that we love each other; I don't see anything—

Q. Do you feel it has in any way adversely affected them for them to see you and Mrs. Guise together?

A. No, I think it's a normal thing for people to see people in love, and because the divorce hasn't been finished, I don't think the children should be restricted, and I don't know how long the divorce is going to go on. And I want to see my children, and I want to be able to go out to dinner with my children, and I don't want to have to [hear my wife] say, I want to hear you say it that she's not going to be there. I don't want to be restricted that way. There's nothing immoral about our relationship in relationship to those children at all. I want to take them with me, there are places that we

want to go, we've had a lot of good times, I'm speaking of from May to December. I'd like to have those again.

Q. How would you contrast May to December when you have been with Mrs. Guise and your children, that situation as one would think of as a family type of situation, would you compare it with that?

A. It's a very good relationship, yes. She's not their mother, but it was a family-type relationship.

Record at 24a–25a.

In its opinion the lower court makes the following statement regarding the mother's request that Ms. Guise not be allowed to be present when the children visit the father.

This is not the first case where such a request has been made of us and we have, on a few occasions, imposed similar conditions upon visitation. In other cases we have denied the request because we felt that the request was motivated more by resentment on the part of the mother than by concern for the welfare of the children. In the case now before us, however, we perceive a situation as being somewhat different because here the mother's concern is something which does bear considerably upon the welfare of the children. Here we have a mother concerned about how her children are going to react to visitations with their father who is still married to their mother but having "a close association" with another woman in the light of what they have been taught at home and in church regarding such relationships. We do not think that the courts can say with any degree of certainty that such experiences will not adversely affect the children. Even if the children tell us now that it makes no difference to them, we wonder if it is fair to rely upon the judgment of the children in such matters. It is only recently that we have begun to scratch the surface of the long range traumatic effects upon our children of what happens to them mentally and emotionally during custody disputes and the ultimate dissolution of the marriage of their parents. One thing is certain—

there is nothing in the evidence of this case or of any other that says that such relationships *enhance* the welfare of the children.

Lower court slip opinion at 2–3.

I have two differences with this statement; the first concerns the facts; the second, the law.

My difference with the lower court concerning the facts is that I do not share the lower court's opinion of the mother's motivation; in my opinion, her request regarding Ms. Guise *was* in large part a result of resentment. I have no hesitancy in expressing this opinion, for "[a]lthough we will not nullify the fact-finding function of the hearing judge, we are not bound by deductions or inferences made by the lower court from the facts as found." *Commonwealth ex rel. Ulmer v. Ulmer,* 231 Pa.Super. 144, 147, 331 A.2d 665, 667 (1974). Moreover, the scope of our review is broad. *Commonwealth ex rel. Holschuh v. Holland-Moritz,* 448 Pa. 437, 292 A.2d 380 (1972); *Scarlett v. Scarlett,* 257 Pa.Super. 468, 390 A.2d 1331 (1978) (J. 1055/77). I suggest that as one reviews the record here, the mother's motivation becomes plain. Not that the mother is to be blamed; quite to the contrary, it would be astonishing if she were not resentful of someone who, while purportedly her best friend, has, as she must see it, stolen her husband and destroyed her family. The sharp edge of her feelings shows perhaps most clearly in the following testimony:

Q. Do you have problems with the picture in your mind of your husband and Alice Guise and the children sitting around the table at mealtimes and so forth?

A. Very definitely. In a family unit you have a father and a mother, a husband and a wife, and the children sitting around the table, and I think when Ray and Alice sit at the table with my children Alice is in my place. And as Ray's wife that is my place, and it's not her place. And in teaching the children what the family unit is and what the family structure is, that's not right. She should not be sitting in my place in front of the children as a family unit.

Record at 75a.

The father testified that he considered the mother's request regarding Ms. Guise a form of retaliation. Record at 28a. This appraisal is supported by the mother's testimony. As shown in the testimony just quoted, she maintained that Ms. Guise's presence would interfere with her teaching the children what the family unit is. In fact, however, there is no family unit; the parties are bitterly and irrevocably separated. The mother, for example, will not let the father inside her house:

Q. Why is it then when he appears at your home on Springs Avenue that you won't even let him in the house?

THE COURT: You mean Ridge Avenue?

Q. Ridge. Why won't you let him in the house?

A. Mr. Heiser, when Ray left our home, when he walked out a year ago, I had a very difficult time with the children adjusting to my home without Ray, and the children adjusting to the home without their father, and having Ray in and out, I think, confuses them and confuses me.

Q. Well, wait a minute now, what—

THE COURT: Go ahead.

A. The children and I have left that house, and we're in our own house now, we're renting a house, it's not Ray's house, it's not in his name, it's my house and the children's house, and we're trying to build our lives, and I want Ray to see the children, but I would much prefer that he see them away from my house, and I don't want them asking or thinking that daddy did this in here and daddy did that in here. He doesn't have a part in that house.

Q. Mrs. Drum, I'm not saying that he does, don't misunderstand me, but I think the point has been made. The children want to see their father?

A. Yes, they do.

Q. Yet despite this fact you take the position that even though Trevor is sick if you want to see your father he's here, go out on the front porch.

A. I have said he can't come in the house. I haven't seen one of the children too sick to walk out the door if the child really wanted to. They could sit in the car.

Record at 87a–88a.

There is another force, in addition to resentment, that we should recognize as behind the mother's objection to Ms. Guise's presence, which has nothing to do with teaching the children about "the family unit" or about "what's right"; it is money. Thus, the mother testified that the father has refused to make any sort of provisions for her future support. Record at 100a. Implicitly, at least, the father admitted this. When asked about the mother's request for support, he answered: "She's a healthy woman, a healthy woman can teach. Alice [Guise] works, I work." Record at 52a. According to the father, the mother said to him that if he would pay what she asked, "[Y]ou can have your divorce tomorrow," and be free to see the children without any restrictions. Record at 39a, 49a–50a. He also testified that the issue of Ms. Guise's presence did not arise until the master's hearings. Record at 40a. Can there be any doubt about what has happened? The father won't pay what the mother thinks she needs for support. The mother fights back. She contests the action in divorce. She contests his visitation petition. If he wants Ms. Guise and the children on his terms, let him pay what she needs.

Again, I am afraid this may sound harsh to the mother; but it is not so intended, and should not be so understood. To her, the father's conduct must seem selfish in the extreme: After she bears him three children, he leaves her, and wants everything his own way. Furthermore, given the fact that under Pennsylvania law a woman is entitled to no support after divorce, the mother may well have found herself in a most difficult position—one in which she felt compelled to fight back. My purpose, in other words, is to blame no other, but rather simply to observe that when we

are asked to decide a case, we should pay attention to the nature of the struggle the parties are engaged in; if we do not, our decision will surely miss the point; and to treat this case as though it involves family unity and moral teaching, instead of resentment and money, is to miss the point.

My difference with the lower court on the law is with respect to burden of proof. As shown by its statement, which has been quoted above, the lower court imposed on the father the burden of proving that his relationship with Ms. Guise—which the court earlier in its opinion characterized as "meretricious"—did not adversely affect the children's welfare. Thus, while making no finding that in fact there was any adverse effect, the court said: "One thing is certain—there is nothing in the evidence of this case or of any other that says that such relationships *enhance* the welfare of the children." This was error. The law is settled that it was the mother's burden to prove that the children's welfare would be adversely affected by Ms. Guise being present then they visited their father. Thus in *Commonwealth ex rel. Meta v. Cinello,* 217 Pa.Super. 94, 268 A.2d 135 (1970), it was held that a father may not be denied visitation rights unless the visits would be detrimental to the best interests of the children. In *Commonwealth ex rel. Lotz v. Lotz,* 188 Pa.Super. 241, 244, 146 A.2d 362, 363 (1958), it was held that "[t]he cases in which visitation rights of a parent have been *limited* or denied have been those in which severe mental or moral deficiencies of the parent have constituted a real and grave threat to the welfare of the child." (Emphasis added) *And see Commonwealth ex rel. Sorace v. Sorace,* 236 Pa.Super. 42, 344 A.2d 553 (1975), which is perhaps the case most in point. There the mother and father were married, but the father left to live with another woman, by whom he had a child. While not condoning his conduct, we nevertheless affirmed an order granting him the right to have his children visit him at his home—not overnight—since the children were "fully aware of the circumstances" and not adversely affected by them.

Here there was no evidence that Ms. Guise represented any threat to the children's welfare; the lower court's failure to find any threat is therefore hardly surprising. The father and his witnesses were uniform in testifying that the children were not adversely affected. *See, e. g.,* Record at 59a (where Ms. Guise says the children treated her no differently than they had over the years), 63a (the friend's testimony), 70a (the minister's). The mother expressed her personal beliefs, *see, e. g.,* Record at 77a and 99a ("[W]hen they are with their father they are not learning what I think are basic good moral values right now as long as he's a married man." "I do not think it's healthy for children to see displays between a married person and an unmarried person."), but such expressions, apart from their motivation, fall short of saying that the children were adversely affected. She offered no evidence that the children had ever done or said anything manifesting any adverse influence attributable to Ms. Guise. Perhaps most telling is the children's own appraisal of the situation. The following occurred between the court and Alison, the eldest child:

Q. Now we have come to the problem of Mrs. Guise, is this a problem for you?

A. I understand that it's wrong, but I'm not saying that I don't like her. I like her as a person and she was my mother's best friend so we got to call her Aunt Alice, and we were very close and everything. And all of a sudden trouble arose and it sort of got complicated. I understand the situation, but I'm not saying I don't want her with us.

Record at 107a–108a.

Between the court and Trevor:

Q. Now, Trevor, your father is asking for visitation privileges, and your mother has said that she has no objection to visitation privileges, and apparently you and your father do have a lot of fun going backpacking and things like that. Your mother does object to having Mrs. Guise present, do you know Mrs. Guise?

A. Yes.

Q. And she has her own reasons for not wanting Mrs. Guise to be present, how do you feel about that?

A. I like her, she's nice.

Q. And are you saying that it doesn't make any difference to you whether she's there or not there?

A. I like it when she's there.

Q. Do you feel as though your father would pay more attention to you, do more things with you if she wasn't there?

A. No.

Record at 114a–115a.

Between the court and Jessica:

I want to talk to you a little about visiting with your dad. Your dad wants to have you with him, would you like to go visit with him from time to time? Do you know Mrs. Guise at all, do you know who I'm talking about? She used to be one of Mommy's friends and you used to call her Aunt Alice, did you?

A. Yes.

Q. When you visit with your daddy, would it make any difference to you if Mrs. Guise was there?

A. No, not really.

Record at 118a–119a.

Since there was therefore no evidence that Ms. Guise's presence would in any way adversely affect the children, the lower court should not have ordered that the father could have the children only if Ms. Guise stayed away. *Commonwealth ex rel. Sorace v. Sorace, supra; Commonwealth ex rel. Meta v. Cinello, supra; Commonwealth ex rel. Lotz v. Lotz, supra.*

This conclusion, however, should not end our consideration. As mentioned above, when the lower court held its hearing, the father's suit for divorce was in process. The master's report recommended that the father be granted a divorce, and the mother filed exceptions to the report. Since the visitation hearing, the exceptions have been heard and sustained; the father was denied a divorce; the father

appealed to this court, and by *per curiam* order we affirmed the denial. *Drum v. Drum*, 260 Pa.Super. 381, 394 A.2d 602 (1978) (J. 1140/78). In summary: The divorce was sought on the ground of indignities. The master found that the marriage had deteriorated to a point where it was beyond repair—a finding amply supported by the parties' testimony in the visitation proceeding. However, the court of common pleas held—correctly in our view—that the master's findings did not go beyond showing incompatibility, which under Pennsylvania law is not sufficient reason for divorce. Thus the situation of the parties is very different than it was when they testified in the visitation hearing. The mother has "won": the father must support her, and he cannot marry Ms. Guise. Given this turn of events, the mother's request to the lower court—that the "[father's] girlfriend . . . not be permitted to be present during any of the visitations until . . . a final decree in divorce is entered . . . ."—is no longer responsive to the parties' situation. What is needed now is another look. So far as mutual love and family unity are concerned, the marriage between the parties is over; it nevertheless remains as a legal shell. Now how will the parties plan their lives? And how will the children fit into those plans?

The issues raised by these questions are more acute than were the issues considered by the lower court when it conducted the visitation hearing. Then perhaps something might be said for the lower court's order, if the order were regarded as a temporary expedient. Then it might be said: "After all, does it make so much difference that Ms. Guise can't be present when the children visit their father? The mother's answer to the father's petition shows, and she testified, that as soon as the divorce became final, so far as she was concerned, Ms. Guise was entitled to be present. Record at 91a. Let's just wait a bit. Soon the divorce will be final, and that will settle the matter." Now, however, we know we cannot uphold the order by any such reasoning; the father is not going to get a divorce—at least, not in Pennsylvania.

I have no idea what a further hearing would show, but I am clear in my mind that one should be held, and held in accordance with the law as stated in such cases as *Commonwealth ex rel. Sorace v. Sorace, supra.*

The order of the lower court should be vacated and the case remanded for further proceedings consistent with this opinion.