450 A.2d 111

**In re CUSTODY OF Jessica TEMOS and Andrew Temos, minor children.**

**Appeal of Cathy A. TEMOS.**

Superior Court of Pennsylvania.

Argued Aug. 25, 1982.

Filed Sept. 10, 1982.

Petition for Allowance of Appeal
Denied Jan. 11, 1983.

84

Sandor Engel, Allentown, for appellant.

John R. Mondschein, Allentown, for participating party.

Before SPAETH, CAVANAUGH and HOFFMAN, JJ.

SPAETH, Judge:

On this appeal the mother of two children asks that we reverse an order awarding custody of the children to their father. The children are a 7½ year old girl and a 6 year old boy. They have spent most of their lives with the mother and under her care have done well. In awarding custody of

them to their father the lower court particularly relied on three factors: that the mother "maintained a close relationship with a married man;" that the mother was involved in two questionable financial transactions; and that since the parties' divorce, "the mother has become increasingly career-oriented [and] has placed heavy reliance on baby-sitters." These factors were not a reason to order a change in custody. The married man is black and the mother and father are white. The lower court regarded this difference in race as a factor that "ought" to be considered. It ought not have been. The evidence does not show either that the mother's relationship with a married man or her need to work has had any adverse effect on the children, or that the financial transactions were in fact questionable. We believe that the best interests of the children will be served by continuing the mother's custody of them. We therefore reverse.

The parties were married on November 24, 1973. It was the mother's first marriage, the father's second. Their daughter, Jessica, was born on March 23, 1975, and their son, Andrew, on August 7, 1976. The parties lived in Bath, near Allentown, Pennsylvania, although the father was required by his employment in the construction industry to be away from home for extended periods. In 1977 the mother returned to work as an operating room technician at a local hospital.

In March 1979 the mother told the father that she wanted a divorce. Shortly afterwards the father went to work in Morocco for nine weeks. Upon his return he was served with a complaint in divorce. He then left for Turkey. While the father was in Turkey, the mother, in September 1979, moved with the children to an apartment in Allentown.

In May 1980 the parties signed a separation and property settlement agreement, providing, among other matters, that the father would have "permanent custody" of the children and the mother, "temporary custody," and that the father would buy the family home in Bath. On July 9, 1980, the parties were divorced. On July 10, 1980, the father and his

wife-to-be and her two children by her prior marriage moved into the home at Bath. The father obtained custody of the children but only for one week, because the mother refused to return them after a visit with her. The father and mother each filed an action in the lower court seeking custody of the children. These actions eventually resulted in an agreement that the mother would have custody of the children for ten months of the year and the father, custody for two months in the summer. The agreement was entered in the lower court as a stipulated order of December 4, 1980.

The mother has not remarried. In December 1980 she bought a home in Allentown, and she continues to work at the local hospital, where she is now a supervisor of supply processing and distribution. The father remarried in August 1980. About then, his employer sent him to work in Utah, and he has remained there. In February 1981 he changed employers, going to work for a construction company in Salt Lake City, in a managerial position that does not require him to be away from home for extended periods. In June 1981 the father bought a home in Sandy, a suburb of Salt Lake City, where he lives with his wife and her two children.

In March 1981 Andrew went to live with the father in Utah; Jessica remained with the mother in Allentown. This change was with the parties' agreement. In August 1981 the mother asked the father to return both children. Her position was that she and the father had agreed that Andrew should return if he was unhappy living with the father; that he was unhappy; and that under the stipulated order of December 4, 1980, the children were to be returned to the mother after their summer visit with the father. The father returned Jessica but refused to return Andrew. The mother filed a petition in the lower court asking that the father be held in contempt of the order of December 4, 1980. The father filed preliminary objections challenging the court's jurisdiction. On October 5, 1981, the mother flew to Utah with her mother, met Andrew on his way to school, and brought him back to Allentown. On November 23, 1981,

the father filed a petition in the lower court asking that he be awarded custody of the children, and the mother filed a petition asking that her custody, as provided by the order of December 4, 1980, be confirmed. The lower court held a hearing on March 16 and 17, 1982, and on June 15, 1982, it awarded custody of the children to the father. On July 6, 1982, in response to the mother's appeal, the lower court filed its opinion. On the mother's application we entered a stay of the lower court's order (the lower court had refused a stay). Also, it was apparent that because the children's school year would soon start, the case should be decided as promptly as possible. We therefore ordered that argument would be heard on August 25, 1982, with the record to be transcribed and briefs submitted accordingly.

–1–

### The children's present situation

As we have mentioned, in December 1980 the mother bought a house in Allentown, and she has continued to work at a local hospital. The home is about a block and a half from the apartment where the mother and children had been living. As a supervisor of supply processing and distribution at the hospital, the mother's salary is $19,500 a year. She also receives $89 a week from the father for the support of the children. Her hours of employment are 8:30 to 5:00; she does not work weekends or holidays, and rarely has to work overtime, and then usually no more than an hour. The usual weekday routine is that the family gets up about seven and after breakfast the mother drives the children to school; sometimes she drops them off at the school bus stop. When Andrew was in kindergarten, he got home about 11:30. By then the baby-sitter was there to meet him and make lunch, after which he would take a nap. Jessica gets home at 3:00, which is when Andrew would get home from first grade. The mother gets home between 5:00 and 5:30, sometimes 5:45.

Incident to the hearing the lower court ordered home study reports. The report regarding the mother's home was prepared by a case worker from the Lutheran Home of Topton. The report states:

Mrs. Temos has lived in her home at the above address since December, 1980. The three bedroom townhouse, for which she pays a $392.92 monthly mortgage, is located in a development near Emmaus. The homes in the neighborhood appear well-kept, as does that of Mrs. Temos. There are many young children in the neighborhood, and Jessica and Andrew (the children in question in this custody case) name a long list of playmates and friends they have in the neighborhood. There is a good-sized fenced-in-yard behind the house, in which the children can play. There also is a park/playground about a block from the house. As per mother's orders, they take turns cleaning up their toys in the yard at the end of each day. The family also has a small dog and a cat, for which the children help to care.

The house is very nicely decorated and was very clean on the interviewer's announced and unannounced visits. The children have their own bedrooms. Mrs. Temos said that she plans to remain at this residence. It is less than ten minutes from her place of employment.

With respect to the mother's personal qualities, the home study report states:

Mrs. Temos impressed this interviewer as being a responsible, motivated, and caring person and mother. She exhibited some very effective and consistent parenting skills with her children. Her children seem to be her number one priority. Mrs. Temos is not involved in any outside activities except for a work-related association that requires one meeting per month. She has shown stability and progression in her job. She appears open and honest and has definitely transferred some good values to her children. She also has remained cooperative and supportive of continuing monthly visits between the children and their paternal grandparents.

The home study report also states that "Jessica and Andrew seemed to be healthy, happy, and well-adjusted children. They were very talkative and sociable and appeared at ease when communicating with their interviewer." This favorable opinion was shared by the children's teachers.

Laureen Lewis, Jessica's first grade teacher, testified that "Jessica is a very avid reader," "really above average." "Her vocabulary is excellent for a first grade student . . . . She even has a very good awareness of punctuation, capitalization, . . . that type of thing. . . . And she has begun to write stories and she expresses herself very well." Mrs. Lewis went on to testify that Jessica "excels as well in math and has had no difficulties . . . . [S]he does have excellent academic skills. She picks up concept[s] very quickly. Emotionally and socially I really don't have any problems with Jessica. She is a very nice little girl." When asked her "overall evaluation" of Jessica, Mrs. Lewis replied: "I would say that—I would say that she is an excellent student in all ways in the first grade. In comparison with the rest of the class she is one of the top." N.T. 2–48—2–49.

Joan Nyemscek, Andrew's kindergarten teacher, testified that in "reading readiness [Andrew] is doing very well. He has mastered all his alphabetic skills, prereading skills." "As far as math goes," Mrs. Nyemscek said, "he's well aware of his numerals. He counts way beyond 20 which is what is expected at the end of kindergarten." She reviewed her report, on a school form, of Andrew's manipulative skills and social and emotional behavior, summarizing it as "basically a very good report." In her opinion, Andrew "has a very mature sense structure." When asked her "overall evaluation" of Andrew, Mrs. Nydemscek replied: "He is doing very well academically and socially and emotionally. He is also very well rounded." N.T. 2–32—2–33.

A neighbor and the babysitter also testified, in less detail than the children's teachers or than appears in the home study report but to the same effect. The neighbor's two girls and Jessica played together several times a week after school. The neighbor described Jessica as well-behaved and always appropriately dressed. She said that she knew Andrew less well but that "he seems to get along well with the other children." She was not a personal friend of the mother and only knew her "a little bit," but from what she had seen, especially during the summer, the mother and

90

children seemed close and affectionate towards one another. The babysitter—who the neighbor said "seems very nice"— described the children's and mother's schedules. She said the children were well behaved and that she had "no problem with them." She described their dress, said they were always clean, and told about their play with other children. She said that the mother "pays a lot of attention to them" and that the relationship between the mother and the children was "very loving."

–2–

*The factors relied upon by the lower court*

The lower court entitles its opinion a "memorandum opinion;" the opinion is not divided into findings of fact, discussion, and conclusions of law, but is instead in narrative form with interspersed comments and conclusions. Nevertheless, the basis of the court's order awarding custody of the children to the father is sufficiently clear, and since, as both parties agree, the record is complete, remand for formal findings and conclusions or for further proceedings would only result in unnecessary and therefore undesirable delay. (At oral argument, we may add, counsel for both parties expressed the hope that we would not remand but would make a final decision.)

In its opinion the lower court makes virtually no reference to the testimony, which we have just summarized, of the children's teachers, the neighbor, or the babysitter. The court's only reference to the Lutheran Home's report regarding the mother's home is to say that the report "comments positively about Cathy Temos, her residence, the childrens' [*sic*] progress and development and her suitability for Jessica and Drew." Slip op. at 5. The court's only reference to the teachers' testimony is to say in passing, when discussing another matter, "although the children have done well in school . . . ." Slip op. at 3. This absence of discussion is especially striking. For not only was the testimony extensive and uncontradicted, and most of it by professional, disinterested witnesses, but it was of central importance. The children have for most of their lives been

under the mother's care. In deciding upon their custody, nothing could be more important than knowing, and considering, how they have done. As we have only recently observed:

> If in the past, the primary caretaker has tended to the child's physical needs and has exhibited love, affection, concern, tolerance, discipline and a willingness to sacrifice, the trial judge may predict that those qualities will continue.

> *Commonwealth ex rel. Jordan v. Jordan,* 302 Pa.Superior Ct. 421, 448 A.2d 1113 (1982).

*And see Commonwealth ex rel. Oxenreider v. Oxenreider,* 290 Pa.Superior Ct. 63, 434 A.2d 130 (1981) (stability of children's relationship with their father and his care of them and maintenance of the household warrant reversal of lower court's award of custody to mother); *Commonwealth ex rel. Pierce v. Pierce,* 493 Pa. 292, 426 A.2d 555 (1981) (lower court should have considered father's uninterrupted care and devotion to daughter, and that the mother's concern was demonstrated by past neglect and empty promises).

Instead of recognizing and giving weight to the beneficial effects on the children of the care and home that the mother has provided, the lower court concentrated its attention on certain aspects of the mother's life that it disapproved of.

After an opening chronological summary of the parties' marital and employment histories, the lower court states:

> Cathy Temos admittedly maintains a close relationship with a married man, Wilburt Banks ("Wilburt"), a technologist in a New York hospital, who resides in the Bronx, New York, and is black. They met at a work-related conference. They admittedly spend two-to-three weekends a month together, sharing the same bed, at the mother's Allentown town house and have persistently done so for the last year and a half. Their bedroom is across the hall from the children's bedroom. Although the children have done well in school, their absences are suspiciously more frequent when Wilburt visits. On several occasions, the children, their mother and Wilburt

visited and slept in Wilburt's one-bedroom New York apartment. Wilburt has recently experienced financial difficulties. Cathy Temos has supported Wilburt's efforts to skirt the bankruptcy court by allowing his car to be titled in her name in Pennsylvania. Moreover, there is evidence that she also supports her babysitter's efforts to skirt the welfare authorities by paying her cash while the sitter receives a grant for her own children. While it appears that the children consider their relationship with Wilburt in a favorable light, it can be said rather assuredly and we have so concluded that the manner in which she and her male friend have pursued their relationship will hardly add to the positive development of the children. While not by itself determinative of the outcome of this case, this non-marital relationship is a factor properly considered in arriving at our decision. *Commonwealth ex rel. Grimes v. Grimes,* 281 Pa.Super.Ct. 484, 422 A.2d 572 (1980). Although Wilburt testified that two weeks before the hearings began in this case he filed a divorce action, and stated that when he is financially able to do so he will pursue a divorce, uncertainties exist as to whether he and Cathy Temos will eventually wed each other. He observed that it will be difficult to do so but that he is willing to relocate here and seek a position in the business world. Wilburt has two teenage daughters from his marriage; they both reside with their mother.

Slip. op. at 3–4.

After this statement the court refers, among other matters, to the parties' separation and property settlement agreement and to the mother's having brought Andrew back from Utah. The court then states:

> While faced with no other choice when their marriage ended, the mother has become increasingly career-oriented. She has placed heavy reliance on baby-sitters.

Slip op. at 5.

The court then refers to the home studies, summarizing each very briefly as favorable (we have quoted the court's summary of the study of the mother's home; its summary of the

study of the father's home is very similar). The court then refers to its interview with the children.

In concluding its opinion the court states:

Clearly both parents love Jessica and Drew and have deep concern for their future welfare.

We concluded, however, that it is the father who can provide the most favorable setting for the physical, intellectual, moral and spiritual well-being of these children and the constancy of love, direction and discipline. He enjoys a stable, loving marriage with a wife who is willing and able to share their home with the children.

Slip op. at 6.

The court adds that it is

not unmindful that changing their residence from Pennsylvania to Utah may cause Jessica and Drew some temporary discomfort ... [but] once they are settled they will have the opportunity to grow up in a normal, stable and secure environment.

Slip op. at 7.

–3–

*What order will serve the children's best interests?*

Sometimes decision in a child custody case, as in any case, will turn upon the credibility of the parties and their witnesses, going one way or the other depending upon which side is believed. In such a case we will not disturb the lower court's findings, for we recognize, gladly, and yield to, the lower court's superior ability to appraise credibility, it having seen and heard the witnesses. *Commonwealth ex rel. Berman v. Berman,* 289 Pa.Superior Ct. 91, 432 A.2d 1066 (1981); *In re: Custody of Hernandez,* 249 Pa.Superior Ct. 274, 376 A.2d 648 (1977). This case, however, is not such a case. The lower court made no findings on credibility, nor did it need to. There were, to be sure, some differences in the testimony, but the essential evidence is uncontradicted. The issue is not, therefore, what are the facts, but rather, what inferences should be drawn from the facts.

■ In deciding what inferences should be drawn from the facts, either as the facts appear from the record or as they have been found by the lower court from conflicting testimony, our single-minded effort is to serve the children's best interests. *Commonwealth ex rel. Pierce v. Pierce, supra* 493 Pa. at 295, 426 A.2d at 557; *Commonwealth ex rel. Parikh v. Parikh,* 449 Pa. 105, 296 A.2d 625 (1972). In making that effort we always give the closest attention to the inferences that the lower court has drawn. For child custody cases are among the most difficult of cases, and we pretend to no special wisdom regarding their proper disposition. *Commonwealth ex rel. Berman v. Berman, supra* 289 Pa.Super. at 93, 432 A.2d at 1067. We are not, however, in any sense bound by the lower court's inferences. To the contrary, we must draw our own inferences. *Davidyan v. Davidyan,* 230 Pa.Superior Ct. 599, 603, 327 A.2d 145, 147 (1974). For our scope of review is very broad. "We must exercise an independent judgment based on the evidence and make such an order on the merits of the case as right and justice dictate." *Commonwealth ex rel. Pierce v. Pierce, supra* 493 Pa. at 296, 426 A.2d at 557. *And see Robert H. H. v. May L. H.,* 293 Pa.Superior Ct. 431, 434, 439 A.2d 187, 189 (1981) ("we shall engage in a broad and comprehensive review of the record and reach an independent decision regarding the placement of the children in the custody of either party."); *In re Custody of White,* 270 Pa.Superior Ct. 165, 167, 411 A.2d 231, 232 (1979) ("the Commonwealth's overriding concern for the well-being of its children" demands that we conduct an independent evaluation of the evidence).

■ Mindful of our responsibility to exercise our independent judgment and make such an order as right and justice dictate, we have concluded that here, custody of the children should be awarded to the mother. We may explain our conclusion by discussing, (a) why the factors relied upon by the lower court do not support the court's award to the father; (b) certain other factors urged upon us by counsel for the father; and (c) what seem to us to be the dispositive factors.

As will appear, we find ourselves, as to some aspects of the case, in quite fundamental disagreement with the lower court. That disagreement illustrates, and is a manifestation of, the difficulty of child custody cases. Every current of our lives flows through them. They engage our most deeply held beliefs, recall our most poignant experiences. No concern is more precious than our children, not simply because we care so much about their present happiness but because the future depends upon their wholesome growth. If in expressing our disagreement with the lower court our comments sometimes seem severe, that only reflects the importance of the issues. The lower court, like us, must make an independent decision. Like us, it must struggle with questions to which there are no simple answers. Here, the lower court was meticulous in assuring that the record was full and complete; it conducted the hearing in a manner that ensured the development of the issues; and it filed an opinion defining those issues in all their complexity and difficulty. While in the end we arrive at conclusions different from the lower court's, we are aware of, and wish explicitly to acknowledge, our indebtedness to the lower court. If the law is to grow, and by growing, respond to our society's needs, it can only be by open dialogue between the courts.

–a–

We think it apparent from the lower court's opinion, the essential parts of which we have quoted *supra,* 116, that in awarding custody of the children to the father the lower court particularly relied on three factors: that the mother "maintains a close relationship with a married man," who is black; that the mother was involved in two questionable financial transactions; and that "the mother has become increasingly career-oriented [and] has placed heavy reliance on baby-sitters." Slip op. at 3, 5. As will appear, this summary of the factors relied on by the lower court is confirmed by statements made by the court in the course of the hearing. Another way to summarize the lower court's opinion is this: The father's home represents a "sound,

stable and secure environment," slip op. at 7, in which the father's wife "is willing and able to share their home with the children," *id.* at 6. It is in the children's best interests to place them in such an environment as compared to the environment provided by an unremarried mother who works and must use a babysitter, who has a close relationship with a married man who is black, and who has engaged in questionable financial transactions.

It will be convenient first to discuss the lower court's view of the financial transactions, for the discussion may be brief. The man referred to by the court is Wilburt Douglas Banks, the married man with whom the mother has a relationship.

The lower court states:

Wilburt has recently experienced financial difficulties. Cathy Temos has supported Wilburt's efforts to skirt the bankruptcy court by allowing his car to be titled in her name in Pennsylvania. Moreover, there is evidence that she also supports her babysitter's efforts to skirt the welfare authorities by paying her cash while the sitter receives a grant for her own children.

Slip op. at 3.

With respect to skirting the bankruptcy court: The automobile was purchased in March 1981. N.T. 3–13, 3–69. At that time Mr. Banks was going through bankruptcy proceedings and did not want the title to the automobile in his name. N.T. 3–69. He therefore gave the mother money to purchase it in her name. N.T. 3–13, 3–69. This does cause some suspicion. However, there is no evidence that the transaction represented a fraud on creditors. Counsel for the father would, it seems likely, have proved fraud if he could. As the record stands, the lower court's statement that Mr. Banks tried "to skirt the bankruptcy court" is no more than speculative.

With respect to the babysitter: On cross-examination the babysitter testified that she had been working at a nursing home but in May 1981 had left her job because she had moved. The following then occurred:

Q. Since that time have you been collecting public assistance?

MR. ENGEL [counsel for the mother]: Objection.

THE COURT: Are you prepared to show that she's been collecting public assistance while being paid as a baby-sitter?

MR. MONDSCHEIN [counsel for the father]: I am coming along with that, yes.

THE COURT: Objection is sustained. It's irrelevant so far as this case is concerned. That may be for another case another day another Court. But it has nothing to do with this one.

N.T. 2–73.

There is no evidence either that in fact the babysitter did collect public assistance while being paid as a babysitter, or that if she did, the mother knew it. Moreover, having ruled that whether the babysitter was collecting public assistance was "irrelevant" "and has nothing to do with this case," the lower court should not then have made the matter relevant by citing it against the mother.

In summary: No evidence regarding the mother's finances supports the lower court's decision to take custody from her and award custody to the father. The evidence is, rather, that the mother has steadily progressed in her work to the point where she earns a respectable salary, and that she manages her money prudently, takes good care of the children and is buying a home, which she maintains in neat and good condition.

We may now turn to issues of greater importance: the lower court's consideration of the fact that Mr. Banks was black, that he was married, and that the mother had to work.

Counsel for the father argues in his brief that "the father never contended that the race of Douglas [the mother and children call Mr. Banks by his middle name] was a factor to be considered by the lower court and he is not so contending now." Brief for Appellee at 24. The fact remains that the

lower court did consider race a factor. This is suggested by the court's reference to race in its opinion, but it appears more clearly from the transcript of the hearing.

After counsel's questioning, the lower court questioned Mr. Banks. In the course of this questioning, the court said:

It doesn't appear on the record but I suppose it is appropriate for it to appear on the record. It's obvious to the Court that you are black and that Mrs. Temos is white and the father of the children is white as well. And I suppose that is something that should appear on the record if either side decided to appeal whatever ruling we are making in this case. That is the only reason I am making note of that.

N.T. 3–16.

The court then asked whether there had been "any talk at all between you and Jessica and Drew concerning that difference in color?"

THE WITNESS: No.

THE COURT: The subject has never surfaced?

THE WITNESS: The only time I think it surfaced, that it ever came up, they asked me why is my hair not as straight as theirs. That was it.

N.T. 3–17.

The court asked counsel whether they had any further questions. Counsel said they did not. The court then said it had one other question. It then asked about when and in what circumstances the mother and Mr. Banks had met (it was at a surgical technologists' convention in New York City in June 1979), after which the court excused the witness. Counsel for the mother then said that "since the subject [of race] was broached now," he wished to submit a trial memorandum citing "two cases which refer to the fact that an interracial relationship is not a relevant consideration." N.T. 3–19. The court replied:

THE COURT: As far as we're concerned it's relevant in this Court making a decision. It is a factor. There are many factors to consider in a child custody matter and I

think this is a factor. It certainly may not be a determinate factor.

MR. ENGEL: Well, if I—I think if the Court would look at those decisions on that point.

THE COURT: We will be happy to look at it, yes. N.T. 3–19—3–20.

Counsel then asked the mother to take the stand, but before her testimony started, the court said:

THE COURT: I didn't mean to suggest, and I am hopeful that my questions did not imply, that I—it was certainly a determinative consideration. But it's obvious and became obvious to the Court that it's something that is involved in the case and that it ought to be—that there were questions that were appropriate, as there were several weeks ago when I had a child custody case involving a parent of Japanese descent and one of American nationality.

That became a concern because of the upbringing of the children, the concern for a lot of the disciplines and involvements of Japanese nationality, in their way of living, and the concern that was expressed as to the adaptability of the children one way or the other under those circumstances. I am sure that when that case is relatively disposed of, that will be something that the Court will consider. So, we think this is something as well to be considered.

N.T. 3–20—3–21.

■ This was error, of the most serious dimension. In a child custody case, race is not a "consideration," or "concern," or "factor." Questions about race are in no respect "appropriate." In stating that race "ought to be" a consideration, the lower court was fundamentally mistaken.

To be sure, the court was not mistaken in its statement that "it's obvious" that "[race is] something that is involved in the case." For it *is* obvious that racial prejudice exists. And while no evidence suggests that the children have so far encountered racial prejudice, no doubt because of their mother's, and their own, relationship with a black man they

may some day be taunted, excluded, or otherwise treated meanly. But that has nothing to do with deciding who should have custody of them.

A court may not assume that because children will encounter prejudice in one parent's custody, their best interests will be served by giving them to the other parent. If the children are taunted and hurt because they live with a black man, with love and help they may surmount their hurt and grow up strong and decent—the sort of children any parent would be proud of. *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Lucas v. Kreischer,* 450 Pa. 352, 299 A.2d 243 (1973). *See also, In re Davis,* 288 Pa.Superior Ct. 453, 432 A.2d 600 (1981); *Mulligan v. Davison,* 244 Pa.Superior Ct. 255, 367 A.2d 299 (1976).

We know that may not happen. No feature of our society, neither religious intolerance nor economic greed, is more damaging than racial prejudice. Perhaps the children will not surmount their hurt. But a court must never *yield* to prejudice because it cannot *prevent* prejudice. Let the court know that prejudice will condemn its award, it must not trim its sails. Coke said it best: "God send me never to live under the law of Convenience or Discretion." *See* 3 Historical Collections, 1721–1722, App. 81 (Rushworth, ed.). A court should declare the law. If the court frames its decree in consideration of convenience or discretion, it betrays the law. For it yields to the anticipated reaction of those who object to the law, and would object to the decree if the decree declared the law. A court that yielded to considerations of convenience and discretion would not have declared that a black child may attend any public school, *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); play at any public park *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974); *Tillman v. Wheaton-Haven Recreation Asso.,* 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); live in any neighborhood, *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88

S.Ct. 2186, 20 L.Ed.2d 1189 (1968); *Buchanan v. Warley,* 245 U.S. 60, 38 S.Ct. 16, 62 L.Ed. 149 (1917). The fundamental principle of our law is that all persons are created equal. A court's decree should always exemplify that principle.

In addition to considering Mr. Banks's race, the lower court was concerned with the fact that while spending weekends with the mother and children he has been married to another woman. This concern combined with, and reinforced, the court's concern that because the mother was unmarried and had to work, she had to depend upon babysitters. We have quoted the lower court's expression of these concerns in its opinion, *supra* at pages 116. To this may be added a similar but somewhat fuller statement by the court, made at the end of the hearing:

We believe—we have no reason not to believe that both parents love both of these children and care a great deal for them. As we indicated before it's easy to understand why that's so after talking with the children. They are both charming and lovable children.

No matter what this Court decides they need both parents. That is to say whether we should rule in favor of the father or the mother that the children need two parents in order—I have seen enough youngsters in my courtroom, both in child custody cases and in juvenile cases and other phases of the court, to know and to conclude that children who are from broken homes as well as children who are not from broken homes have a difficult time making it in society. Those who comes [*sic*] from what the community might consider are perfectly fine, happy, loving married homes have troubles and those who come from homes that are not in that fashion have more trouble. So, they need both parents who will deport themselves in that fashion.

I think we would be remiss if we didn't say that no matter what we decide we do not approve of the living arrangements whereby there is a transient mate involved and that is without regard to anything but the transient nature of that relationship. We do not believe that that is

in the best interest of the children and it is the children alone that are the concern of the Court.

We do not believe that that kind of relationship, which is for several days per month, is the kind of relationship that will engender a sense of well being, a sense of security and all the other things which are important to youngsters. So, we would hope that no matter what our decision is that that relationship will either cement or become uncemented as the case may be.

We do believe that is something that will be in the best interest of these children over any protracted period of time. I know in saying that that will probably make me sound like an old stodgy judge and I know that mores and standards of the community have changed about a lot of those things. But so far as the welfare of the children, I don't believe that is a change and I think that that is something that I hope the parties will all take into consideration. That is not intended to indicate how we will rule in this case. It's an observation that I think has to be made.

N.T. 4–66—4–68.

We share the lower court's "stodgy" belief that one of life's greatest blessings is a happy marriage. We also agree with the lower court that the sense of well being and security engendered by a happy marriage are important, and may be critical, to a child's wholesome development. These propositions, however, in no way support the lower court's award. One may believe that the best environment for children to grow up in is in the care of a happily married mother and father. But that belief is of no help here. The children's mother and father are *not* happily married. The sort of environment in which the lower court would *like* to put the children is not, and cannot become, available. Of course the lower court knew that. Its error was to analogize the father's home to the home provided by a happily married mother and father. But the analogy has no support, either in the record of this case or in common experience. True, the father is happily remarried, his wife stays at home and

cares for her children, and she would stay at home and care for the father's children. Also true, the mother has not remarried, she maintains a week-end relationship with a man married to someone else, and she must work and therefore cannot stay at home and care for her children. It doesn't follow from these facts that the father's home would be a better environment for the children. One must know much, much more.

■ In terms of legal reasoning, the lower court's error was to think in terms of presumptions. Because the court knew *certain limited* facts it *presumed* that *other* facts would be true. This sort of reasoning used to be typical in child custody cases. The most frequent example of it was in cases in which a court knew that the children were of "tender years." On the basis of those limited facts the court would presume that the children would grow up more happily in their mother's care. But courts may no longer reason by presumption in child custody cases. Not only has the tender years presumption been explicitly repudiated, *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980); *Commonwealth ex rel. Spriggs v. Carson,* 470 Pa. 290, 299–300, 368 A.2d 635, 639–40 (1977) (plurality opinion); *McGowan v. McGowan,* 248 Pa.Superior Ct. 41, 374 A.2d 1306 (1977); *Commonwealth ex rel. Lee v. Lee,* 248 Superior Ct. 155, 374 A.2d 1365 (1977), but so have all other presumptions. In a custody dispute between parents, *no one* has the burden of proof; *no* presumption may be resorted to; instead, the court must determine according to the evidence *in the particular case* before it what will serve the children's best interests. *Ellerbe v. Hooks, supra,* 490 Pa. at 372, 416 A.2d at 516 (FLAHERTY, J., concurring); *Commonwealth ex rel. Spriggs v. Carson, supra,* 470 Pa. at 300, 368 A.2d at 639–40 (plurality opinion); *In re Custody of Hernandez,* 249 Pa.Superior Ct. 274, 376 A.2d 648 (1977).

■ Accordingly, we have repeatedly held that if one of the parties is involved in a non-marital relationship, the court must not presume that the relationship will have a bad effect on the children. Instead, the court must examine the

facts of the particular relationship and on the basis of those facts determine what effect the relationship *has* had on the children. *Summers v. Summers,* 273 Pa.Superior Ct. 285, 417 A.2d 651 (1979); *Rupp v. Rupp,* 268 Pa.Superior Ct. 467, 408 A.2d 883 (1979); *Commonwealth ex rel. Staunton v. Austin,* 209 Pa. Superior Ct. 187, 194, 223 A.2d 892, 894 (1966). The court may find that a parent's non-marital relationship has had a bad effect on the children, or that the relationship demonstrates that the parent is so immature or emotionally unstable as to be unfit to raise the children, and such a finding will of course support an award of custody to the other parent. *Commonwealth ex rel. Drum v. Drum,* 263 Pa.Superior Ct..248, 397 A.2d 1192 (1979). But the *mere fact* of a non-marital relationship—evidence of the relationship *without more*—will not support an award. *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976); *Commonwealth ex rel. Sorace v. Sorace,* 236 Pa.Superior Ct. 42, 344 A.2d 553 (1975).

The lower court did not go about making its decision this way. Instead, it said, "[W]e have so concluded that the manner in which she [the mother] and her male friend have pursued their relationship will hardly add to the positive development of the children." Slip op. at 4. This is presumptive thinking. Instead of inquiring whether the mother's relationship with Mr. Banks has had a *bad* effect on the children, the lower court contented itself with saying that there was no evidence of a *good* effect; indeed, the court went further, ruling out even the *possibility* of a good effect ("[the relationship] will hardly add to the positive development of the children").

The lower court states in its opinion that the mother and Mr. Banks

admittedly spend two-to-three weekends a month together, sharing the same bed, at the mother's Allentown town house and have persistently done so for the last year and a half. Their bedroom is across the hall from the children's bedroom. Although the children have done well in school, their absences are suspiciously more frequent when Wil-

burt visits. On several occasions the children, their mother and Wilburt visited and slept in Wilburt's one-bedroom apartment.

Slip op. at 3.

Several observations may be made regarding this statement.

First, the court's statement cannot be regarded as a finding that the mother's relationship has had a bad effect on the children. As we have just discussed, the court expressly *refused* to find any bad effect, instead contenting itself with finding no good effect.

Second, in some respects the court's statement is not supported by the record. The children's teachers found nothing untoward about the children's absences. Mrs. Lewis, Jessica's teacher, testified that Jessica missed nine days for the school year '81–'82, that all of her absences had been excused, and that "[i]n first grade they don't have too much immunity [from childhood diseases]. So, I wouldn't say that it's a bad attendance, no." N.T. 2–47. Mrs. Nyemscek, when asked about Andrew's absences, testified: "Normal. He had two absences in December, three in January and four in February. Well, it's not—it's not abnormal absence." N.T. 2–32. As regards the children going to Mr. Banks's apartment in New York, the evidence is that that happened only once. N.T. 3–16.

Third, it is evident from the tone of the court's statement that the court disapproves of the mother's relationship with Mr. Banks. This also appears from the court's statement at the end of the hearing that it hoped "that that relationship will either cement or become uncemented as the case may be." N.T. 4–67. Nothing in the evidence suggests, however, that the relationship has had a bad effect on the children. The evidence to which the court refers—the duration of the relationship; the location of the children's bedroom; their absences from school; their visit to New York—does not show bad effect. And other evidence shows good effect. Mr. Banks testified that "[w]henever I come there [the mother's home] or whenever I come to the door they always

run to give me hugs and kisses." N.T. 3–15. The mother testified that Mr. Banks

> plays with them very well. They are always wanting piggy back rides and jump all over him. And he doesn't seem to mind it at all. He enjoys it.

> He plays word games with them. And they make—he is very amused by them. He laughs a lot. They have a very good time. We have a very good time together.

> Q. Have the children discussed Doug with you?

> A. Yes, they have.

> Q. What have they said about Doug?

> A. Drew said well, mommy, isn't he going to be your husband. I said well, eventually probably. Why can't he move in now, we have a lot of fun when he is here. And things like that. Jessica says the same sort of things, why do we have to wait. I said because things take time. I explained to them he has to find employment here and he has other things to take care of first. And that seems to satisfy them pretty well as to why they have to wait to have him here all the time.

> N.T. 3–50—3–51.

In the home study report the counselors from the Lutheran Home said:

> Throughout contacts with the children, they expressed enjoyment regarding the time they spend with Mr. Banks in and out of the household. They acknowledged the racial differences but appeared comfortable with them.

The father argues nevertheless that the fact of the mother's relationship with Mr. Banks counts against her having custody without reference to, or any proof of, bad effect on the children. He cites *Commonwealth ex rel. Drum v. Drum,* 263 Pa.Superior Ct. 248, 397 A.2d 1192 (1979); *Commonwealth ex rel. Grimes v. Grimes,* 281 Pa.Superior Ct. 484, 422 A.2d 572 (1980); *McAnallen v. McAnallen,* 300 Pa.Superior Ct. 406, 446 A.2d 918 (1982); and *L. D. v. B. D.,* 291 Pa.Superior Ct. 589, 436 A.2d 657 (1981), and also some psychiatric literature. He particularly relies upon the statement by Judge HESTER in *McAnallen* that it is a "fallacy"

to say that "it is the effect of the nonmarital relationships of the mother upon the child and not the fact of the relationship itself which is crucial," since "the harmful effects upon young female children, of their mother's open, notorious, and numerous nonmarital relationships cannot possibly be evaluated until the child is in a position to emulate the conduct of her mother, normally in puberty, long after custody has been determined." *Id.,* 300 Pa.Super. at 416, 446 A.2d at 923.

In *Drum* the majority said: "It is well established that a parent may not be denied custody or even visitation solely because of an involvement in a meritricious relationship." 216 Pa.Superior Ct. at 250, 397 A.2d at 1193 (citations omitted). In *Grimes* the majority said: "The mere fact of a parent's non-marital relationship is not sufficient to deny him or her custody of the children . . . . It is the effect of the non-marital relationship on the children and not the fact of this relationship which is the crucial factor to be considered by the court." 281 Pa.Superior Ct. at 488, 422 A.2d at 574 (citations omitted). Thus *Drum* and *Grimes* stand for the very proposition the father argues against. This is also true of *McAnallen.* There the majority reversed the lower court, holding that its "emphasis upon the moral aspects of Appellant's relationship with Ed constituted error because the testimony revealed that this relationship did not have an adverse effect upon the children." 300 Pa.Superior Ct. 414, 446 A.2d at 922 (citation omitted). In reaching its decision the majority discussed at some length why "[t]he trial judge must never impose his own moral code upon the facts in a custody dispute" but must instead always look to whether the non-marital relationship has had a bad effect on the children. *Id.* The statement by Judge HESTER in *McAnallen* was in a separate opinion—a fact that counsel for the father neglects to acknowledge in his brief—and cannot be understood as representing the law. Also, it may be noted, there is no evidence here of the "open, notorious, and numerous nonmarital relationships" referred to by Judge HESTER. Finally, in *L. D. v. B. D.,* the mother had engaged in conduct—an affair with a 15 year old boy—that showed she

was too emotionally unstable and immature to be entitled to custody. The decision makes plain that it was not the fact of the nonmarital relationship that was important but the mother's character, as disclosed by the relationship. This is consistent with settled law. *Commonwealth ex rel. Likovich v. Likovich,* 220 Pa.Superior Ct. 202, 287 A.2d 156 (1971) (sexual promiscuity showed "unrelenting" and "reckless" immaturity); *Commonwealth ex rel. Burke v. Birch,* 169 Pa.Superior Ct. 537, 83 A.2d 426 (1951) ("flagrant and persistent immoral conduct"). *And see Gunter v. Gunter,* 240 Pa.Superior Ct. 382, 361 A.2d 307 (1976) (collecting cases). There is no such evidence here.

Implicit in the father's argument, and in the lower court's statements, is the suggestion that not to condemn nonmarital relationships is somehow to approve them, that while some "old stodgy" judges adhere to old fashioned virtues, others yield to, if indeed they do not accept, modern standards of sexual conduct. This line of thought misreads, and misses the point of, the cases.

The fact is that standards of sexual conduct have changed. In 1978, 22 out of 100 marriages ended in divorce while in 1960, 9 marriages out of 100 ended in divorce.[1] In 1978 19.2 per cent of all children under 18 lived with one parent; in 1960 only 9.4 per cent of all children lived with one parent.[2] Judges should not decide custody cases as though these were not the facts. The law does not exist to insist upon the past.

■ We don't know what will become of the mother's relationship with Mr. Banks—whether it will "cement" or "uncement." We admit to some skepticism about its future. Although both parties testified that they intended to marry, Mr. Banks has started divorce proceedings only recently; his work is and for some eighteen years has been in New York; and he would apparently not move to Allentown unless he could find work there. It may well be that the parties will

1. U. S. Department of Commerce, Bureau of the Census, Current Population Reports, Special Studies, Series P–23, No. 84, Table 1 (June, 1979).

2. *Id.* Table 6.

end by never marrying. But that is no reason why the mother should not have custody of the children. Is a court to say to an unmarried parent, You may not have custody of your children because you have had a sexual relationship with someone—*even though* the evidence shows that no harm has been done the children? That would serve no useful purpose. It would severely punish the parent for transgressing the court's personal standards of morality. But the punishment would be idle, and idle punishment is no one's business, certainly not a court's. No evidence, or experience, suggests that the parent's standards, or the standards of other single parents, would be changed to conform to the court's—although perhaps secretiveness or marriages of convenience would be encouraged. Neither does any evidence, or experience, suggest that the children would be helped; if their parent were driven into secretiveness or a marriage of convenience, matters might be made worse for them. In any event, a custody decree is not meant to punish a parent, or anyone else; its only purpose is to help the children. *Rupp v. Rupp,* 268 Pa.Superior Ct. 467, 469, 408 A.2d 883, 883 (1979); *Commonwealth ex rel. Drum v. Drum,* 263 Pa.Superior Ct. 248, 249–250, 397 A.2d 1192 (1979). *Gunter v. Gunter,* 240 Pa.Superior Ct. 382, 390, 361 A.2d 307 (1976). This purpose must never be forgotten, either by the parties in their presentation of the evidence, see *Gunter v. Gunter, supra,* 240 Pa.Superior Ct. at 401, 361 A.2d at 317 ("It is not unusual in custody cases to discern a desire by the parents to hurt each other, and to use the child to do so.") or by the court. It is to ensure that it is not forgotten, but, rather, is so far as possible achieved, that the cases require that the evidence must show that the nonmarital relationship has had a bad effect on the children. There being no such evidence here, it was error for the lower court to assign the mother's nonmarital relationship with Mr. Banks as a reason to award custody of the children to the father.

It remains to discuss the weight the lower court gave to the fact that the mother must work. In its opinion, as we

have noted *supra,* 117–118, the lower court said that "[w]hile faced with no other choice when their marriage ended, the mother has become increasingly career-oriented. She has placed heavy reliance on babysitters." Also: "[The father] enjoys a stable, loving marriage with a wife who is willing and able to share their home with their children."

It is not apparent what the lower court intended by its statement that "the mother has become increasingly career-oriented." It is true that the evidence shows that the mother has been promoted at work, and thus, that she has made progress in her career. We assume, however, that the court did not mean that a working woman should *not* seek promotion. To "become increasingly career-oriented" seems to us to be a compliment, not censure—to be one way of saying that the mother has become increasingly interested in trying to do better and more responsible and challenging work. To be sure, if a parent's desire for promotion were to result in interfering with the parent's ability to care for the children, then that would be evidence against awarding custody to the parent. For example, a parent who insisted upon accepting a promotion even though the promotion would require extended absences from home might very well not be entitled to custody. Choices have to be made, and it is a fair question for a court to ask whether a parent cares more about achieving a promotion or being able to devote time to the children. But here there is no evidence that as the mother has become increasingly career-oriented, the children have suffered. The evidence is to the contrary. The mother has bought a home ten minutes from work. She is able to take the children to school most mornings. Her hours are regular: she is home well before supper, and rarely has to work overtime. And she does not have to work weekends or holidays.

Because the mother must work, she does, it is true, have to use a babysitter. However, with Andrew in first grade, both children will be in school until about 3:00, so that they will be in the sitter's care only for a few hours—until the mother comes home between 5:00 and 6:00. The father's

working hours are substantially the same as the mother's. By awarding the children to the father the lower court did not ensure that they would have any more time with the father than they now have with the mother. It only ensured that they would have a few hours a day with the father's wife instead of with a babysitter.

It is apparent from its opinion that the lower court regarded this change as important. According to the court, the change would enable the children to "have the opportunity to grow up in a normal, stable and secure environment." Slip op. at 7. We find no evidence in support of this conclusion.

Although we do not know how many children are cared for by a parent and a stepparent, statistics do tell us that the single-parent household has become more "normal" in recent years than it had been in the past. Of all families with children under 18 in 1960, 8.5 per cent were one-parent families; in 1978, 18.9 per cent of all such families were one parent families.[3] Nor is there any reason to suppose that a two-parent environment is more "stable and secure" than a one-parent environment. The fact that most children *used* to be raised by a working father and a non-working mother is not a reason. Most children used to be raised that way because divorce and working mothers were both unusual. The point may be stated abstractly. If at a given time (say, 1880) Condition A (the traditional family) prevails, and at another given time (say, 1980), Condition A *and* Condition B (the one parent family) *both* prevail, then the only way to decide in 1980 which condition is better is to *compare* the two, *not* to insist upon the past. Sometimes the comparison will show that the children's best interests will be served if they are raised in the traditional family, other times, if they are raised in the one-parent family. It will all depend upon the particular facts. As with every other aspect of a child custody case, the court may not resort to generalizations, especially not generalizations derived from the past. It must focus upon the case before it.

3. *See id.* Table 3.

Here the evidence is that the father could provide the children with an environment excellent in many respects, and in material terms, better than the environment the mother can provide. The home study report describes the father's home and neighborhood as follows:

Glenn and Darlene Temos reside in a white, brick home at 8488 Escalante Drive in Sandy, Utah. The neighborhood is zoned exclusively for one-family dwellings. It is located near Willow Creek Country Club. Most of the homes in this area are brick of rather large size and were built about 15 years ago. The residents are primarily home-owners with above-average income. The culture of Utah is considered to be child-centered with a population that is leading the nation in the birth rate per capita. Education and family life is a value the majority of the community share. The homes in the Temos' neighborhood appear to have owners who take pride in their gardens, green lawns and artistically-landscaped yards.

The exterior of the Temos' home is as well-maintained as the neighboring homes. The interior of their home is very clean and tidy. The furnishings are comfortable, of excellent quality and carefully color-coordinated to create a pleasant visual experience. The home has a large, front room with a fireplace, a dining room-kitchen with an adjoining eating area, a television-recreation room; three bedrooms and one bath are downstairs. There is a master bedroom suite created by combining two bedrooms and another bedroom with two baths upstairs. There are storage rooms for food and toys, plus a laundry room.

Further:

The data from collateral sources was consistent with information presented by Glenn and Darlene Temos during the home visit. It appeared that Glenn and Darlene Temos have good judgment and are sincerely convinced that Andrew's and Jessica's present environment in their natural mother's home is not conclusive [sic] to healthy emotional development.

. . . . .

Glenn and Darlene Temos had more positive factors and fewer negative factors than any other parents evaluated by this worker in the past 17 years. It is this worker's opinion that Jessica and Andrew Temos would thrive emotionally, socially, educationally, and physically in their father's home. Glenn Temos expressed his desire to have legal custody of his children and have them maintain a relationship with their mother.

In addition, we may add, the father makes $850 per week, or over $44,000 per year.

Some of the evidence detracts from this favorable picture. This is the father's third marriage. The question therefore arises whether it will prove more stable than his first two. The home study report of the father's home is perhaps less persuasive because less disinterested, less objective, than the report of the mother's home. The caseworker who studied the father's home criticizes the mother's qualities as a parent because of her relationship with Mr. Banks. The fact that she chose to condemn a woman she had never met on the basis of hearsay from two obviously biased sources raises some question about her judgment and, therefore, of the accuracy of her report. Finally, there is some evidence that the children would not in fact be happier in the father's home. When questioned by the lower court, the children expressed their love for each parent but were unable to decide definitely with whom they would prefer to live. Jessica's teacher testified that about two weeks before the hearing she had asked the children to write a story about having one wish, "And Jessica raised her hand and she did say at that time if I had one wish, it would be to stay with my mother. That was the only time she ever mentioned it [the matter of which parent she would prefer to live with]." N.T. 2–49. The case worker from the Lutheran Home reported a similar conversation:

Jessica and Andrew seemed to be healthy, happy, and well-adjusted children. They were very talkative and sociable and appeared at ease when communicating with this interviewer. They indicated consistently their desire to remain with their mother.

During the interviewer's conversations with the children, they indicated a desire to maintain contact with their father through phone calls and visits. Andrew had some concern over being picked on by his step-siblings during his extended visit, but the children did not indicate any specific problems with the stepmother. In making comparisons regarding living in Utah and Allentown, both children expressed a preference for their present environment, i.e. school, living arrangements, and activities. Both children did like the climate in Utah and the swimming pool at their father's home.

While the children did not express a clear preference for either parent when interviewed in chambers, they both complained about excessive teasing by Jeff and Jenny, the father's wife's children. Jessica said "sometimes they treat me like I'm an animal, like they throw me around," N.T. 4–23, and she contradicted the father's and his wife's assertions that she and Andrew were never left in their step-siblings care, N.T. 4–26—4–27. Andrew appeared to be particularly disturbed by the teasing, telling the court that they "beat us up," N.T. 4–43, "[m]ore than once," id.

We do not believe that any of this evidence is entitled to much weight. Expressions by children as young as Jessica and Andrew should no doubt be heard but they must be discounted and certainly cannot be dispositive. *Shoup v. Shoup,* 257 Pa.Superior Ct. 263, 390 A.2d 814 (1978) (child's preference not controlling but a factor to be considered along with child's maturity and intelligence); *Gunter v. Gunter, supra* 240 Pa.Super. at 389 n. 2, 361 A.2d at 311 n. 2 (concerning a child of seven "It may be noted that David'd youthfulness required some rather considerable discounting of what he said.")

We are satisfied that the father's home and financial circumstances are most desirable, that he loves the children, that he and his wife would give them good care. This said, it is equally apparent that the mother's home and financial circumstances are entirely adequate, that she too loves the children, and that she too would give—and has given—them

good care. Comparing the two homes, we find no basis for the lower court's statement that the father's home would be any more "normal, stable and secure" than the mother's.

–b–

The father has argued two matters that it is convenient to discuss separately. The father says that the mother has neglected the children's health, Brief for Appellant 48–50, 55, and that the mother's "brazen abduction of Drew from his father's custody in Sandy, Utah," in October 1981 is "[t]he best example of the mother's apparent inability to distinguish between right and wrong as regards these children." *Id.* at 37, 36; *see generally,* 36–41. We believe that counsel rather overstates the evidence.

The medical incidents cited by the father are an injury to Andrew's eye in the Spring of 1978, when he was one and a half; a skin rash that Jessica has had from time to time; a fever she suffered in February 1980; and treatment for her "lazy eye." We think it unnecessary to discuss any of these in detail. Some of the incidents are old—well before the father agreed in December 1980 to the stipulated order that the mother should have custody of the children for ten months of the year. None of them appears to have been truly serious—not nearly so serious as parents regularly encounter in the course of raising young children.

The mother's abduction of Andrew, however, requires more comment, for it was a serious incident. As we have mentioned when outlining the facts, *supra* at 112–113, in March 1981 Andrew went to live with the father in Utah. Jessica joined him for the summer. In August 1981 the father returned Jessica to the mother but refused to return Andrew. In October 1981 the mother went to Utah and brought Andrew back to his school in Allentown.

■ We have repeatedly condemned child-snatching as a way of resolving a custody dispute, *Commonwealth ex rel. E. H. T. v. R. E. T.,* 285 Pa.Superior Ct. 444, 427 A.2d 1370 (1981); *In re Leskowich,* 253 Pa.Superior Ct. 349, 385 A.2d 373 (1978); *In re Custody of Meyers,* 242 Pa.Superior Ct.

116

225, 231, 363 A.2d 1242, 1245 (1976) (SPAETH, J., concurring). We have declined to consider a custody action by a parent who had engaged in this practice. *Commonwealth ex rel. Zaubi v. Zaubi,* 275 Pa.Superior Ct. 294, 418 A.2d 729, affirmed, 492 Pa. 183, 423 A.2d 333 (1981); *See,* Uniform Child Custody Jurisdiction Act, 42 Pa.C.S.A. § 5349. This case, however, does not involve an attempt to thwart ongoing legal proceedings or to punish the other parent. *Cf. Parks v. Parks,* 284 Pa.Superior Ct. 400, 426 A.2d 108 (1981) (mother's removal of child to Georgia not sufficiently reprehensible to refuse jurisdiction where action was taken pursuant to custody decree that gave custody of child to mother, and where father refused to return child). Here, while we do not excuse the mother's conduct, we note several extenuating facts. Under the stipulated order of December 4, 1980, she had the legal right to Andrew's custody. Her understanding of the agreement with the father was that the father would return Andrew if Andrew became unhappy; the father's understanding was the same, as appears from his answer on cross-examination that "[i]f either one [of the children] expressed an interest to be with the other one, expressed an interest to the parent that had the child, that they would be returned." N.T. 57. It was the mother's view that the father persuaded Andrew to go to Utah by promising him that "he would no longer have to go to a day care center, he could have a large yard, bigger bedroom, more toys, and more material benefits" than she could provide, N.T. 3–27, and while the father said that he "didn't promise him anything special," N.T. 57–58, he admitted "mention[ing]" to Andrew "[t]hat he would be going to a school that would be close to where we lived . . . . That he would have a bed, his own bed, a room. I don't know, just standard things." N.T. 57. The mother testified that Andrew soon asked to come back but that when she asked the father to allow him to, he replied that "if you send me $500 I will consider that he will come home, otherwise you can forget it." N.T. 3–30. The father did not deny this conversation. As we have indicated, in his interview with the lower court Andrew corroborates the mother's testimony in

that he said he was unhappy with the way the stepchildren treated him. Also, he told the court that he "feeled better" when his mother brought him back to Allentown. N.T. 4–44. The mother didn't have the $500 to send. N.T. 3–30. When the summer was over and the father returned Jessica alone, the mother first sought to have the father held in contempt of the stipulated order of December 4, 1980. It was only after the father filed preliminary objections to the petition for a contempt order that she went to Utah and snatched Andrew. It appears to us—as it so often does— that neither the mother's nor the father's conduct is above reproach, but that the mother's conduct does not manifest such a disregard of the law as to warrant denying her custody of the children.

–c–

Many other matters might be discussed. We despair of ever being able to respond to every argument made by a litigant in a child custody case. We are satisfied, however, that we have considered all of the father's arguments. It is now in order to state what facts seem to us to require the conclusion that the mother should have custody of both children.

We return to the point at which we started. For most of their lives, and for most of the time since the parties separated, the children have been under the mother's care. They have done well. As the lower court commented at the end of the hearing, "They are both charming and lovable children." N.T. 4–66. The evidence indicates, and we assume, that the father and his wife would also provide good care. But we see no reason to order a change. We have commented at some length on the reasons advanced by the lower court, and have explained why none of them supports or indicates a change. Neither has the father suggested any reason we find persuasive.

Both the Supreme Court and this court have repeatedly emphasized the importance of continuity in a child's life. In *Ellerbe v. Hooks,* 490 Pa. 363, 416 A.2d 512 (1980), the

Supreme Court awarded custody of a child to her grandmother in preference to her father on the ground that the child "had developed stable and happy relationships with her grandmother, with neighborhood friends and, importantly, at school." *Id.,* 490 Pa. at 371, 416 A.2d at 515. In *In Interest of Tremayne Quame Idress R.,* 286 Pa.Superior Ct. 480, 493, 429 A.2d 40, 47 (1981), we said, quoting *Pamela J. K. v. Roger D. J.,* 277 Pa.Superior Ct. 579, 592, 419 A.2d 1301, 1307 (1980):

> This court has noted the importance to a child's development of a stable relationship with an established parental figure and a known physical environment. *Haraschak v. Haraschak,* 268 Pa.Superior Ct. 173, 417 [407] A.2d 886 (1979); *Tomlinson v. Tomlinson,* 248 Pa.Superior Ct. 196, 374 A.2d 1386 (1977); *Sweeney v. Sweeney,* 241 Pa.Superior Ct. 235, 361 A.2d 302 (1976); *Gunter v. Gunter,* 240 Pa.Superior Ct. 382, 361 A.2d 307 (1976). "There can be no question that stability is important to a child's welfare, and that in deciding who should have custody of the child it will therefore always be essential to consider how long the child has spent with [the parties]." *In re Hernandez,* 249 Pa.Superior Ct. 274, 296, 376 A.2d 648, 660 (1977).

And in *Hugo v. Hugo,* 288 Pa.Superior Ct. 1, 6, 430 A.2d 1183, 1185 (1981), we said:

> [T]his court has long recognized that the removal of a young child from his environment is a factor which bears on its emotional well being. *In re Custody of Phillips,* 260 Pa.Superior Ct. 402, 408, 394 A.2d 989, 992 (1978), *Commonwealth ex rel. Children's Aid Society v. Gard,* 362 Pa. 85, 97, 66 A.2d 300, 306 (1949). Therefore continued residence of children with one parent may be controlling. *Commonwealth ex rel. Children's Aid Society v. Gard, supra; Commonwealth ex rel. Cutler v. Cutler,* 246 Pa.Superior Ct. 82, 88, 369 A.2d 821, 824 (1977).
>
> *Commonwealth ex rel. Kraus v. Kraus,* 185 Pa.Superior Ct. 167, 138 A.2d 225 (1958).

We believe that here the children's continued residence with the mother is controlling.

The order of the lower court is reversed and custody of the children is awarded to the mother. The case is remanded so that the lower court may provide for the father's visitation with the children. We do not retain jurisdiction.