J-A05015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| M.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| V.M.F. | : | |
| | : | |
| Appellee | : | No. 1339 WDA 2016 |

Appeal from the Order August 8, 2016
In the Court of Common Pleas of Blair County
Civil Division at No(s):  2006 GN 2267

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and MOULTON, J.

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MARCH 3, 2017**

Appellant, M.S. ("Father"), appeals from the order entered in the Blair County Court of Common Pleas, which granted primary physical custody of the parties' minor child, A.M.S. ("Child"), to Appellee, V.M.F. ("Mother"), subject to periods of partial physical custody by Father.  We affirm.

In its opinions, the trial court fully and correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.

Father raises two issues for our review:

> WHETHER THE [TRIAL] COURT ERRED AND ABUSED ITS DISCRETION IN TRANSFERRING RESIDENTIAL CUSTODY OF…CHILD TO…MOTHER, WHEREIN AN ANALYSIS AND APPLICATION OF THE FACTORS TO BE CONSIDERED, PURSUANT TO 23 PA.C.S.A. § 5328, FAVORS…FATHER AND/OR A SHARED CUSTODY ARRANGEMENT, AND THEREBY THE [TRIAL] COURT SUBSTANTIALLY LIMITED FATHER'S        PERIODS        OF        CUSTODY,        THEREBY

DEPRIVING…CHILD OF HIS FATHER'S CARE FOR EXTENDED PERIODS DURING THE SCHOOL WEEK, WHEN THE PARTIES HAVE EQUALLY SHARED CUSTODY OF…CHILD SINCE 2006?

WHETHER THE [TRIAL] COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO CONSIDER CHILD'S PREFERENCE, WHEREIN HE CONTINUED TO DESIRE TO HAVE AN EQUALLY SHARED CUSTODY ARRANGEMENT TO REMAIN THE SAME, ON A WEEK ON/WEEK OFF BASIS, WHEREIN THE PARTIES WERE BOTH ACTIVELY INVOLVED IN CHILD'S LIFE AND BOTH EQUALLY CAPABLE OF PROVIDING FOR HIS NEEDS?

(Father's Brief at 4).

Our scope and standard of review of a custody order are as follows:

[T]he appellate court is not bound by the deductions or inferences made by the trial court from its findings of fact, nor must the reviewing court accept a finding that has no competent evidence to support it…. However, this broad scope of review does not vest in the reviewing court the duty or the privilege of making its own independent determination…. Thus, an appellate court is empowered to determine whether the trial court's incontrovertible factual findings support its factual conclusions, but it may not interfere with those conclusions unless they are unreasonable in view of the trial court's factual findings; and thus, represent a gross abuse of discretion.

\*   \*   \*

[O]n issues of credibility and weight of the evidence, we defer to the findings of the trial [court] who has had the opportunity to observe the proceedings and demeanor of the witnesses.

The parties cannot dictate the amount of weight the trial court places on evidence. Rather, the paramount concern of the trial court is the best interest of the child. Appellate interference is unwarranted if the trial court's consideration of the best interest of the child was careful and thorough, and we are unable to find any abuse of discretion.

*A.V. v. S.T.*, 87 A.3d 818, 820 (Pa.Super. 2014) (quoting *R.M.G., Jr. v. F.M.G.*, 986 A.2d 1234, 1237 (Pa.Super. 2009)).

With respect to a custody order, Section 5328(a) provides:

**§ 5328.  Factors to consider when awarding custody**

**(a)   Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1)   Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2)   The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3)   The parental duties performed by each party on behalf of the child.

(4)   The need for stability and continuity in the child's education, family life and community life.

(5)   The availability of extended family.

(6)   The child's sibling relationships.

(7)   The well-reasoned preference of the child, based on the child's maturity and judgment.

(8)   The attempts of a parent to turn the child against the other parent, except in cases of domestic violence

where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a). "The court shall delineate the reasons for its decision on the record in open court or in a written opinion or order." 23 Pa.C.S.A. § 5323(d). In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." *M.J.M. v. M.L.G.*, 63 A.3d 331, 336 (Pa.Super. 2013), *appeal denied*, 620 Pa. 710, 68 A.3d 909 (2013). A

court's explanation of the reasons for its decision, which adequately addresses the relevant custody factors, complies with Section 5323(d). ***Id.***

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Hiram A. Carpenter, III, we conclude Father's issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Trial Court Opinion, filed August 8, 2016, at 9-22) (examining each relevant factor under Section 5328(a); concluding award of primary physical custody to Mother as ordered is in Child's best interests). Accordingly, we affirm based on the trial court's opinion.

Order affirmed.


Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/3/2017

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

M. S.
          Plaintiff                    :
                                       :
                                       :
     v.                                :NO. 2006 GN 2267
                                       :
V. M. F.          ,                    :
          Defendant                    :

HONORABLE HIRAM A. CARPENTER, III      SENIOR JUDGE

TERRESSA GEORGE, ESQUIRE               COUNSEL FOR PLAINTIFF

MICHAEL COHEN, ESQUIRE                 COUNSEL FOR DEFENDANT

## OPINION AND ORDER

This matter comes before the Court for resolution of all issues relating to the custody of these parents' only child, A.M.S.    , born May    2004.  A hearing was held to a conclusion on December 30, 2013.  At that hearing, both parents testified to their positions regarding the primary custody of A.M.S. .  It was agreed A.M.S. would be interviewed by the Court which interview occurred on December 31, 2013.  The record is presently closed.

At hearing, we heard the testimony of both parents as well as [Stepmother] (the Father's wife since February 2, 2013); Jessica (Mother of Noah, a close friend of A.M.S.); and Deborah (a long time friend of the Mother).  Finally, as noted on the day following our evidentiary hearing we interviewed A.M.S.

1

#43

Historically, the parties' custodial arrangement is unusual in our experience. Both parents agree their relationship never went beyond dating prior to A.M.S.'s conception. The Mother was with the Father during a relatively short period of time while she endured a separation from a long term relationship with another man. This developed into a situation (for different reasons according to each parent) where the Father did not know A.M.S. was "his" until a significant period of time after A.M.S.'s birth (the Mother estimates this as more than two years while the Father estimates it as more than one year). In any event, the Father immediately committed to A.M.S. upon learning he had a son. This quickly evolved by early 2006 into essentially a fifty-fifty custody arrangement. That fifty-fifty relationship has continued in various forms through our December 30, 2013 hearing.

Presently, the Mother comes before the Court offering her belief the time has come to end the fifty-fifty relationship which has existed these many years. In place of the existing fifty-fifty relationship, the Mother believes the custody arrangement should be that she has primary residential custody with the Father maintaining substantial contact with A.M.S. through a combination of his coaching at the school and a schedule which would give the Father two days (with overnights) centered around his work schedule (rotating weekends involving all days of the week). If

2

this were accomplished, the Mother believes the present communication difficulties which she is experiencing with the Father since their last agreed order in November 2012 and the Father's marriage to Stepmother in February 2013 would likely resolve. The Mother believes these issues of communication and control suggest the time to end the fifty-fifty relationship (in favor of the essentially five day/two day rotation which she suggests) is now.

In response, the Father acknowledges he also would like to achieve primary custody of A.M.S. However, he suggests the fifty-fifty relationship which has been the parents' history should continue for at least some period of time into the future as consistent with A.M.S.'s best interest. In that regard, he suggests to the Court that an alternating three/four, four/three arrangement (again geared to his work regarding his days) might solve the parties' existing communication and control issues by allowing A.M.S. longer periods in each household. Recently, the parties have been exchanging A.M.S. on practically a daily basis under their present fifty-fifty arrangement so daily transfers are more the norm than the exception. The Father believes fewer transfers would aid the parties and benefit A.M.S. . The Father asks that if the Court believes a change is indicated presently he should be the primary residential custodian with the Mother

3

liberally involved. Essentially, this sets out the parties' positions.

As always, our paramount concern in a case whether it involves custody or visitation is the best interest and permanent welfare of the children. <u>Commonwealth ex rel Pierce v. Pierce</u>, 493 Pa. 292, 426 A. 2d 555 (1981). All other considerations are deemed subordinate to the child's physical, intellectual, moral and spiritual well being. <u>In the interest of Tremayne Quame Idress R.</u>, 429 A.2d 40, 43 (1981). Parents do not have a property right in their children. Whatever claim they may make for either custody or visitation rights is to be tested by what is in the best interest of the children. See generally <u>Commonwealth ex rel Children's Aid Society v. Gard</u>, 66 A.2d 300 (1949). A custody decree is not meant to punish a parent or anyone else. Its only purpose is to help the child. <u>In Re: Custody of Temos</u>, 450 A.2d 111 (1982). The clear trend has been to abolish presumptions in custody disputes. In children custody cases, the Court must continually hew to the polestar of a child's best interest eschewing presumption and surmise. <u>Morris v. Morris</u>, 412 A.2d 139, 141 (1979). The Court should avoid mechanical determinations and focus its analysis on a close scrutiny of all particular facts relevant to determining the child's best interest. <u>In Re: Custody of Hernandez</u>, 376 A.2d 648, 653 (1977). Further, the ability to

4

care for a child is to be determined as of the time of the custody hearing, not as of an earlier time. In Custody of Frank, 423 A.2d 1229 (1980). Decisions must be made on the basis of current facts and not the past conduct of the parties. In Re: Leskovich, 385 A.2d 373 (1978). The primary concern in custody matters lies not with the past but with the present and future. Hooks v. Ellerbe, 390 A.2d 791 (1978). Facts at the time of hearing are the foundation for the determination of the Court. Augustine v. Augustine, 324 A.2d 477 (1974). At hearing, each parent shares the burden of proving by a preponderance of the evidence that an award of custody to him or her would serve the best interest of the child. Ramos v. Rios, 378 A.2d 400 (1977). Continuity and stability are important elements in a young child's emotional development. Commonwealth ex rel Jordan v. Jordan, 448 A.2d 1113 (1982).

The principles enunciated above are time honored in Pennsylvania law. More recently, however, as a result of the Pennsylvania's adoption of the new Child Custody Act at 23 Pa.C.S.A. §5328(a), that act directs that when a party files a petition for modification of a custody order, the trial court must perform a "best interest of the child" analysis considering all of the Section 5328(a) factors. Those factors are as follows:

> 1) Which party is more likely to encourage and permit frequent and continuing contact

5

between the child and another party.

2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

3) The parental duties performed by each party on behalf of the child.

4) The need for stability and continuity in the child's education, family life and community life.

5) The availability of extended family.

6) The child's sibling relationships.

7) The well-reasoned preference of the child, based on the child's maturity and judgment.

8) The attempts of a parent to turn the child against other parent, except in case of domestic violence where reasonable safety measures are necessary to protect the child from harm.

9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

10) Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.

11) The proximity of the residences of the parties.

12) Each party's ability to care for the child or ability to make appropriate child-care arrangements.

13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness of inability to cooperate with that party.

6

14) The history of drug or alcohol abuse of a party or member of a party's household.

15) The mental and physical condition of a party or member of a party's household.

16) Any other relevant factor.

As the language of the Act suggests, these factors are not the only factors a Court may consider. However, they are to be included as part of the analysis.

## DISCUSSION

At the outset of our discussion, and before entertaining the statutory factors as the primary format for this Opinion and Order, we acknowledge there is considerable logic to both parents' positions.

As we discussed with the parents at our hearing, virtually every fifty-fifty custody arrangement has a shelf life after which it is no longer the best arrangement for a child. In this Court's experience, the timing of the change from fifty-fifty to some other arrangement usually occurs at three times in the life of a child. The first is when the child commences school. When school begins, often parents live too far apart and in different school districts so it requires a change. A second "time" is during the pendency of elementary school when the parents see changes in themselves and their situations which cause them to conclude one situation or the other is probably better for school and activity

7

purposes. Those few fifty-fifty relationships which survive elementary school are probably most frequently altered when the child (now a teenager) expresses a preference to the parents and that either precipitates an agreement or brings them to court for a determination which almost inevitably disrupts the fifty-fifty custody arrangement.

This case fits none of those categories. In fact, A.M.S. is doing well in school according to both of these parents. He is described by both of them as active, athletic, and able to get along in school, in his activities, and in both households. The pressure which exists regarding the fifty-fifty custody arrangement in terms of its appropriateness seems to center on the inability of these parents (undoubtedly increasing in part because of this custody litigation during the past year) to communicate effectively regarding A.M.S. and to demonstrate the flexibility which usually proves critical to parents attempting a fifty-fifty custody arrangement. We view the case as it was described by the Father when he offered that "the problem with our fifty-fifty relationship is not A.M.S. but rather us (the parents)". We believe the Father is correct.

That said, the positions of the parents come clearly into focus as logical positions. The Mother does not see a bridge over the current problems if the fifty-fifty arrangement is maintained.

8

Conversely, the Father believes the fifty-fifty arrangement continues to be important to A.M.S. and offers that longer periods of shared custody (during the summer, for example, he offered one week/one week as a better arrangement) to reduce tensions. If a fifty-fifty is continued (although we acknowledge this is not the Mother's primary position) the Mother seems to agree with the Father that longer periods of custody would probably be beneficial. This is consistent with her presentation if not her exact words. Our issue involves whether the time to end the fifty-fifty custody arrangement which has represented the norm in this case is now, or whether that decision should be deferred as not in A.M.S.'s best interest presently.

Unfortunately, in making this determination there are some complicating factors. One factor is that A.M.S. has been drawn into this. Part of the Mother's position involves a belief that A.M.S. would prefer to reside with her. The Mother's household includes the Mother's other two children (, Son , age fifteen and daughter , age nine) who are children to two other fathers. Although each parent gives a differing version as to who "confronted" A.M.S. (with the other parent present) to ask him to voice his choice to everyone, this child was put in that situation. Faced with this, A.M.S. said nothing. This is hardly surprising. In fact, we would have been shocked if he had done

9

otherwise under those circumstances. This meeting, however, beyond dividing the Mother and Father further, apparently had some effect on A.M.S, so that the Father (apparently at his own election) placed A.M.S, in counseling with Peggy Nadenick about four weeks ago. As we will discuss later in this Opinion, that A.M.S. is now in counseling is a considerable concern as we do not know what is (or is not) involved. With this foundation, we turn to the statutory factors as enunciated earlier in this Opinion at set forth at 23 Pa.C.S.A. §5328(a) as the basis for further discussion.

**1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.**

We do not see this as a major issue in the case. These parties were never married and their relationship was essentially over by the time A.M.S, was born. However, they have (remarkably in our view) successfully maintained a fifty-fifty relationship for most of A.M.S.'s life. We have every confidence that either of these parents would fulfill a court order as close to the letter as humanly possible. In fact, they have both already done so.

What is lacking in their relationship, and one of the core reasons this hearing was probably necessary became more and more apparent as we listened to the testimony of the parents. While

10

they have been willing to share A.M.S. and have each recognized the importance of the other, they have lacked flexibility in certain limited respects. Each of the parents recounted to us individual events where they believe the other failed the test of true cooperation. As two examples from the Mother's testimony, she believes she has not been fully advised of certain medical decisions which the Father has made relative to A.M.S. Similarly, she was apparently "hurt" during a trip to the beach when A.M.S. did not call her and she believed she had inadequate information where A.M.S. would be. Conversely, the Father raised an issue complaining that the Mother denied A.M.S. the opportunity to be at his grandmother's (the Father's mother's) viewing.

These examples, which we would view generally in the context of a custody litigation as minor obstacles, have become major events for these parents. This is of great concern. Breakdowns in communication and control issues are, in fact, contrary to the letter and spirit that a fifty-fifty arrangement requires if it is to go on into the future. Here we see evidence of that deteriorating. Undoubtedly, this is part of the reason the Mother brings her petition.

For his part, the Father conceded to the Court that he felt in several of the instances which the Mother raised he probable could (even should) have done better. This type of recognition on

11

the Father's part is hopeful in terms of the fifty-fifty arrangement if we can fashion an arrangement which reduces the tensions that are exacerbated presently by daily transfers.

Our issue is far more subtle than whether these parties would follow a court order. We believe they can pass that test. The greater question is whether these parents can achieve flexibility and resolve communication and control issues sufficiently for the fifty-fifty arrangement to go on much longer. For reasons which we will state later in this Opinion we believe this <u>can</u> and <u>should</u> be attempted in A.M.S.'s best interest.

**2)  The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**

Issues of abuse are not present in this case. There is no allegation of abuse by anyone against anyone either past or present. At most, the Mother is concerned about the Father's new wife        ) as perhaps (although not intentionally) disturbing the balance which has existed in the fifty-fifty arrangement. This is a natural reaction (in our view) on the part of the Mother to the introduction of another woman who is important to A.M.S. Of course, the Father's new wife also provides physical safeguards and supervision of the child with the Father. We believe progress needs to be made in this area. However, we do not view that as impossible. In fact, the flexibility already demonstrated by

12

these parents in reaching and maintaining a fifty-fifty arrangement for many years where the Father did not even find out about his child's birth until the child was more than a year old (at least) is remarkable. We believe there is more capability here to resolve things than the parties are inclined to admit in a litigation.

**3)   The parental duties performed by each party on behalf of the child.**

Not surprisingly, this is a strength for both parties. Each of the parents seems to have participated in all aspects of A.M.S.'s life. This has been true regardless of which parent has been "dominant" in a particular area. For example, although the Father has coached A.M.S. , the Mother attends the games and participates in getting A.M.S. to his practices (even attending them on occasion). This same sharing has occurred with respect to school conferences and medical (notwithstanding the recent complaints the Mother has made).

This particular strength – namely, the involvement of both parents in "everything" gives us pause with respect to terminating a fifty-fifty relationship which undoubtedly has contributed mightily in allowing this to occur. At the very least, it suggests we should not do so lightly unless we are well satisfied this will be in A. M.S.'s best interest. We acknowledge a disruption in the fifty-fifty relationship will inevitably change

13

the performance of parental duties where A.M.s. is concerned. That said, we have confidence in each of these parents that the duties will be performed.

**4)  The need for stability and continuity in the child's education, family life and community life.**

This is an important factor in the case from several perspectives.  On the one hand, it is clear A.M.s. has benefited and thrived in a fifty-fifty environment.  On the other hand, it is clear that he does not have the maximum available stability and continuity given the almost daily transfers.  In the end, this is a major problem for most children in a fifty-fifty relationship and increasingly as a child moves toward the teen years and adulthood so the child's own agenda becomes increasingly important as a factor.

In considering this factor, we also acknowledge the parties' fifty-fifty historical arrangement has not been truly consistent either.  The parents have at various times done alternating four days/three days, alternating five days/two days and are now doing what amount to daily transfers during the school week and an alternating weekend arrangement.  A.M.s. has been able to survive and thrive in all these changes.

Since it is our intention to change the daily transfers at a minimum (neither parent seems to favor continuing them) A.M.s. is going to have to make changes no matter whether we adopt a

14

continued fifty-fifty as the Father suggests or award primary residential custody as the Mother suggests. In one sense, it is encouraging (if we can use that word attached to a child in counseling) that A.M.S. will have someone to talk to relative to the changes which are going to necessarily occur as a result of our Opinion. Our issue is not "will there be change". Our issue is which change we will adopt. In either event, we need to provide maximum stability and continuity for A.M.S. We are assisted in that by the fact these parents live only four blocks apart so nothing we do will require a change in school districts or activities. We believe we can enter an order that will satisfy A.M.S.'s need for stability and continuity while reducing some of the parental tensions which will ultimately (if they have not done so already) affect him.

**5) The availability of extended family.**

This is a positive in the case. The Father grew up in Bellwood and his relatives live either in the Bellwood area or in Altoona primarily. All of these resources are available to him. For the Mother, although her brothers are at a distance with the closest residing in Pittsburgh, he is apparently a frequent visitor at the Mother's home for extended periods of time. The ex wife of one of the Mother's brothers is also in the Tyrone area and she maintains contact. The Mother also has a boyfriend in

15

Bellwood (not a resident of her household) who is regularly involved with , A.M.s. All of these relationships appear to be positive from i A.M.s.'s standpoint. It is fair to note the Mother has some concerns regarding the Father's new wife and her role with , A.M.s. The Father has some of the same concerns with the Mother's brothers.

### 6) The child's sibling relationships.

This is potentially an important factor in the case. A part of the Mother's case includes the potential to involve all three of her children, Son, daughter, and A.M.s. , under one roof if she becomes primary residential custodian of A.M.s. She is already primary residential custodian of the other two children with their fathers enjoying periods of partial custody. The joinder of siblings can be an important consideration. In fact, the Mother offered to place Son on the witness stand (he is fifteen) to discuss this issue. We offered to the Mother our belief Son should not testify. This was not due to any belief on our part that i Son could not provide information. Rather, it was protective of Son since nothing Son would say would particularly influence us and the situation (testifying) might not be positive (especially if the outcome was not what Son desired). Frankly, we could not see a good reason to put him in that situation given the offer as to his "desires". This does not

16

mean we do not believe there is a good relationship between Son Daughter and A.M.S. . In fact, we hardly needed /Son's ; testimony to confirm that as even the Father indicated he believed these relationships were good. As matters stand, A.M.S. already has a very real opportunity to bond with his half-brother and half-sister. We have every reason to believe he has done that (including our interview with him). We acknowledge that is not the same, however, as living with them in a primary residential custody situation. If we award the Mother primary custody, this would be one of the positives.

**7) The well-reasoned preference of the child, based on the child's maturity and judgment.**

As noted previously, we did interview A.M.S. . We would describe A.M.S. as reserved and (given the parent's descriptions of him) perhaps extremely so. This was not surprising. After the joint meeting about four weeks ago to get A.M.S.'s "opinion as to where he should reside" we would have every reason to suspect just a matter of common sense that A.M.S. is presently somewhat traumatized by all of this. Our interview with A.M.S. suggested to us we should be cautious since he appeared conflicted (to the extent we could draw any opinion) in a one time meeting with a nine year old. Certainly, A.M.S. made no well reasoned preference. In fact, he made no preference at all and had he made one we would have been well satisfied it was not well reasoned.

17

A.M.S. did not impress us as sufficiently mature to be significantly involved in a decision of this magnitude.

**8)    The attempts of a parent to turn the child against other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

This is another area of almost remarkable strength between these parents.  While they were critical of their relationship with each other and their ability to be flexible at times, there was no claim that either parent has attempted to turn A.M.S. against the other parent or win favor with him where custody was concerned.  Clearly, the Father believes his work ethic demonstrated through his long term employment with Houtzdale State Correctional Institution as well as his wife's military background provide a disciplining atmosphere tc A.M.S. are positive.  The Father's role as coach and mentor of A.M.S. and his relationship with him seem clearly established.  We expect the Father's new wife to further this.  Indeed, one of the Father's recurring themes is that there is a period of adjustment any time A.M.S. comes over to his house to adjust to the "rules of his household".  When we spoke with A.M.S. we talked about these rules and they did not appear to have made any great impression on A.M.S.  As a result, we viewed the Father's perception that A.M.S. might have difficulty following the rules entering his household as just that – namely, a perception as opposed to a definite reality.

18

For her part, the Mother has tailored her work cleaning houses to the needs of the children. She also receives child support from all three fathers as a source of income beyond work. It seems the Mother achieves a successful integrated household when the children are together in a responsible and loving fashion. A.M.S. does have chores when he is at his Mother's which appeared reasonable in our discussion with A.M.S. . While there are undoubtedly differences in the households, these differences do not (in our view) constitute a major area of difficulty at the present time.

**9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

This is a very important (and difficult) issue in this case. Clearly, as this Opinion suggests throughout each of the parties has, in fact, made sacrifices for A.M.S. and has shown the capability of maintaining a loving, consistent, stable and nurturing relationship. If we are to dissolve the fifty-fifty, however, what is much less clear to us is which of the parents is more likely to maintain that in a situation where each of them has done a (mostly) good job to this point. Perhaps an even greater factor is that we do not know A.M.S.'s emotional needs at the present time. Our interview with him developed little on that issue and we are not in a position to even guess at what his

19

emotional needs might be. In fact, A.M.S. has just entered counseling where we (and the parents) will undoubtedly learn more about his emotional needs and be able to make more reasoned decisions than we are in a position to do presently.

One of the real problems if we dissolve a fifty-fifty relationship under which the parents themselves view A.M.S. as essentially successful is what is our alternative. The Mother comes before the Court with the direct response that the correct alternative is her achieving primary residential custody. The Father, on the other hand, believes (and his presentation was almost totally geared to the reasons why) the fifty-fifty relationship should be continued. Only at the end of our hearing did he suggest he was the superior primary residential parent if we chose to terminate the fifty-fifty. In this important regard, from a factor finder's perspective our hearing was somewhat underdeveloped. We hasten to add that this was not the fault of counsel or the parties. In fact, each of the parents appeared prepared to discuss their respective positions as to continuing the fifty-fifty and/or the Mother assuming primary residential custody. The Mother, however, did not spend a great deal of time talking about how a fifty-fifty would be continued if the Court chose to do it. Similarly, the Father did not spend a great deal of time talking about how his household is superior to the

20

Mother's. While the Court is confident this reflects their belief system, it gives us something of a quandary since our record does not develop the areas of the Father's perceived superiority to the Mother as a primary residential custodian nor does it adequately develop the Mother's views as to how we could improve the parties' communication problems and control issues which everyone agrees are the primary source of difficulty presently. This leaves the Court in a situation where we question the adequacy of our own record in those regards and especially if we make a final determination as to primary residential custody. This is compounded by the fact A.M.S. is in counseling which might (or might not) develop information which would assist the Court if we are going to abandon the fifty-fifty as to which household represents A. M.S.'s best interest. The fact the Father is recently married also complicates the situation since this is a major change to his situation.

For us, this is one more reason why the fifty-fifty should continue to be attempted with modifications designed to assist the control issues and communication problems which represent the only issues why this fifty-fifty should not continue at the present time. In all other regards, specifically as they relate to A.M.S. ., the fifty-fifty is an environment in which he can succeed based on the fact everyone says he <u>has</u> <u>succeeded</u> to this point.

21

Where no one sees A.M.S. as "in trouble" that in itself indicates the change is contraindicated.  We also understand A.M.S.'s Father's placing him in counseling may be an indication that A.M.S. is, in fact, in more trouble than this history suggests. This may be part of the litigation cycle and the parents' inability to keep their issues away from A.M.S. .  However, we don't know.  Under those circumstances, it is difficult to determine A.M.S.'s best interest in terms in the household in which he should reside if we terminate the fifty-fifty relationship (which we concede is likely to occur at some point). While we acknowledge this reality, we are uncomfortable choosing between the households at the present time.  If, in fact, we are required to do at some point through the court system we should hold a hearing which emphasized the comparative strengths and weaknesses of each household far more than the record we created on December 30th.  This uncertainly on our part is significant in our view the fifty-fifty relationship should presently be maintained (although altered to try to improve the situation for everyone).

**10) Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.**

Everything we have said on the preceding factor would apply with this factor as well. We have nothing more to add specific to this issue.

**11) The proximity of the residences of the parties.**

This is a great strength in the case. As noted previously, the parties reside only several blocks apart within easy walking distance for A.M.S. . The parties live in a rural community so that they are even more accessible in the same town environment where they reside. No matter what we do, as noted previously, no changes of school district, church or activity structure for A.M.S. are implicated.

**12) Each parent's ability to care for the child or ability to make appropriate child-care arrangements.**

This is not an important issue in this case. This is (again) a credit to both of these parents. To our observation, both parents have the ability to care for A.M.S. and have made considerable sacrifices to do so to a degree which is unusual in our experience. We do not struggle with either parent's ability to make appropriate childcare arrangements when those are required.

**13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

23

The level of conflict in this case is the primary issue in the situation before us. To this point, where A.M.S. alone is concerned we have no doubt the fifty-fifty arrangement (even with all of its alternations and the reality these changes have made the parents somewhat "crazy") has benefited A.M.S. . We do not say this based only on our own observations. We say this because both parents have testified that has been the reality. Because that is true, we believe the issue of primary residential custody has very little to do with A.M.S.'s relative success or failure in the near term and everything to do with the Mother's belief (not unreasonable) that the communication problems and control issues have reached the point where the fifty-fifty relationship cannot continue. Frankly, this Court is not sure whether the Mother is, in fact, correct. Because that is true we are reluctant to enter an order which favors either the Mother (as she suggests) or the Father (as he suggests). In the end, we are not satisfied the parties cannot resolve their communication issues and control problems at the present time so that the fifty-fifty relationship which has been historically beneficial to A.M.S. cannot continue. Of course, we may learn things from A.M.S.'s counselor that this conclusion on our part may no longer be true. What we do know with some sense of certainty presently is that A.M.S. is presently subject to so many transfers and exchanges that the parents'

24

problems are necessarily exacerbated and we believe unnecessarily so. The actions which we intend to take will be designed to make this easier.

When we questioned the Father specifically as to why he desired to go back to a four/three, three/four as the preferred measure of visitation we made an assumption which turned out to be erroneous. Specifically, we assumed when the Father wanted this arrangement his work schedule (rotating two days off involving every day of the week) was at the heart of his request. That did not, however, turn out to be his testimony. When we questioned the Father further inquiring why he was willing to do a week on and a week off in the summer (thinking perhaps we should do that year round to reduce the number of transfers) the Father indicated that, in fact, he favored the week on/week off year round. He explained it was A.M.S.'s counselor who communicated to him that A.M.S. might prefer a three/four, four/three in an attempt to reduce the transfers. It is all well and good for the Father to take that position. However, we do not feel A.M.S. is in the best position to make that decision and, in fact, he should not have any particular input into it. The fact A.M.S. prefers a continuation of what would continue to be a "lot" of transfers between parents who have communication problems and control issues suggests perhaps A.M.S. does not truly understand the situation.

25

In fact, weekly transfers will almost assuredly make this better and we intend to implement them immediately with exchanges occurring Sunday at 6:00 on a weekly basis. We believe this can accomplish many things. First, it will remove for A.M.S. the repetitive transfers and resulting changes in his situation which are occurring so frequently presently. These cannot be good for him over an extended period of time and especially while the parties' conflict level is highest. Second, it will ease pressure on the parents since it will not require so much back and forth between them with opportunities for tensions to arise. Phone contact with A.M.S. during each party's week by the non-custodial parent should be simple, direct, and unimpaired by both parents. However, it should not be designed to make the other household crazy. These parents live close together and given A.M.S.'s school and sports schedule they are both actively involved. That will continue to assure a lot of contact with both parents no matter whose week it is. The Mother has complete access to A.M.S.'s sports schedule (through the other parents, their children, and A.M.S. in addition to the Father). The Father should certainly keep her advised (as that will reduce tensions) by whatever form of communication he is used to do it. While it is not our practice to order it, a short note back and forth as to A.M.S.'s upcoming events at the time of the exchanges on Sunday

26

(or any other convenient time) or a text message which accomplishes that same purpose should suffice to maintain an open line. Frankly, if this does not work we will know that the case probably needs a hearing at which our focus would be which household should become A.M.S.'s primary residence. We simply are not satisfied the time for that action is now. The passage of time and the opportunity for continued counseling should allow us to develop this more fully if we are required to do so. If matters do not improve with the implementation of longer periods of custody, then we will all know there is little hope for the status quo into the future.

We acknowledge this decision may be something of a disappointment to the Mother. We are not saying to her she is not the appropriate primary residential custodian. We are simply saying that any decision in regard to A.M.S.'s situation into the future seems premature. Similarly, we are not saying to the Father that the fifty-fifty is the best relationship for all time. We are only satisfied it is in A.M.S.'s best interest for now. How long that is true will be determined by the parents' attitudes and A.M.S.'s progress.

**14) The history of drug or alcohol abuse of a party or member of a party's household.**

This is not particularly an issue in the case.

27

**15) The mental and physical condition of a party or member of a party's household.**

This is not particularly a factor in the case.

This concludes our discussion of the statutory factors. We believe that on balance the status quo of the fifty-fifty relationship with significant alterations (to weekly exchanges from the present schedule) represents the best alternative to test whether a fifty-fifty custody arrangement can continue to succeed for A.M.S. . If that proves wrong in the judgment of either party, we invite them back and we will certainly hear their positions further. We do not blame either party with respect to the breakdowns in communication and control. They are inevitable at times. It is also significant to us that the period from the time of their last agreement in November 2012 which included the Father's marriage appears to have exacerbated the communication and control issues. Of course, the litigation cycle leading up to this hearing never makes this easier. We are mindful of that. There is a substantial part of our thinking which goes to the possibility that if we can make the periods longer and remove the parties from the litigation cycle for some period of time we can make matters better for A.M.S. and for the parents. If this is not true, we will at least have fairly tested it as it applies to A.M.S's best interest so that everyone will feel more certain that a change needs to be made than is the case presently. All of

28

this is important to A.M.S.'s future. Accordingly, and consistent with all of the above we will enter the following Order:

1. The parents shall share the physical and legal custody of the minor child, A.M.S. , born May 2004. Residential custody of the minor child shall be shared.

2. The time arrangements for the Plaintiff and Defendant shall be as follows:

   a. A.M.S. shall be with his Father on an every other week basis from Sunday at 6:00 p.m. until Sunday at 6:00 p.m., commencing Sunday, February 9th, 2014.

   b. A.M.S. shall be with his Mother on alternating Sundays, with the Mother's first week to commence Sunday, February 16th, 2014.

   c. A.M.S. shall spend the period from the date of this Order leading up to January 12th with his Mother. We understand this will be a partial week which unnecessarily exists due to the date of our Order.

3. Holidays —

   a. Christmas — In even numbered years, the Father shall have the minor child from 3:00 p.m. Christmas Eve until 3:00 p.m. Christmas Day and with the Mother from 3:00 p.m. Christmas Day until December 26th at 3:00 p.m. In odd numbered years, the Mother

29

shall have the minor child from 3:00 p.m. Christmas Eve until 3:00 p.m. Christmas Day and with the Father from 3:00 p.m. Christmas Day until December 26th at 3:00 p.m.

b. Thanksgiving – In even numbered years, the Mother shall have the minor child the day before Thanksgiving at 3:00 p.m. until Thanksgiving Day at 3:00 p.m. and the Father shall have from Thanksgiving Day at 3:00 p.m. until the day after Thanksgiving at 3:00 p.m. In odd numbered years, the Father shall have the minor child the day before Thanksgiving at 3:00 p.m. until Thanksgiving Day at 3:00 p.m. and the Mother shall have from Thanksgiving Day at 3:00 p.m. until the day after Thanksgiving at 3:00 p.m.

c. Memorial Day and Labor Day – In even numbered years, the Father shall have the minor child from 3:00 p.m. the Sunday before the holiday until 7:00 p.m. on Memorial Day/Labor Day. In odd numbered years, the Mother shall have the minor child from 3:00 p.m. the Sunday before the holiday until 7:00 p.m. on Memorial Day/Labor Day.

30

d. Fourth of July – In even numbered years, the Mother shall have the minor child from 9:00 a.m. on July 4th until 12:00 noon on July 5th. In odd numbered years, the Father shall have the minor child from 9:00 a.m. on July 4th until 12:00 noon on July 5th.

e. Easter – In even numbered years, the Mother shall have the minor child the Saturday before Easter at 7:00 p.m. until Easter Sunday at 7:00 p.m. In odd numbered years, the Father shall have the minor child the Saturday before Easter at 7:00 p.m. until Easter Sunday at 7:00 p.m.

f. New Year's (Eve) – In odd numbered years, the Mother shall have the minor child from December 31st at 3:00 p.m. until January 1st at 7:00 p.m. In even numbered years, the Father shall have the minor child from December 31st at 3:00 p.m. until January 1st at 7:00 p.m.

4. Each party shall be permitted to telephone the child at reasonable times and intervals when the child is in the custody of the other parent.

5. The child shall be with the Father on Father's Day and with the Mother on Mother's Day with the times to be from 9:00 a.m. until 9:00 p.m.

31

6. The party having custody of the minor child on his birthday shall celebrate the child's birthday with the child. The parent out of custody on the child's birthday shall celebrate the child's birthday with the child on the next date that they have custody.

7. Transportation to and from the place of physical custody with the subject minor child shall be shared by mutual agreement of the parents.

8. If either party is unable to exercise their physical custody rights at any point and time, they shall provide at least twenty-four (24) hours prior notice to the other party in the absence of an emergency.

9. Each party shall keep the other informed of their current address and telephone number.

10. Each party shall keep each other informed of the child's health, progress in school, school activities and general welfare and shall consult the other parent concerning major decisions affecting the child, to include education, religious training and medical treatment. If an emergency or illness requiring a physicians attention should occur to the child while in their physical custody, each party must notify the other party.

32

11. Each party is entitled to receive directly from schools, health care providers, or other relevant sources, information concerning the child.

12. The parties shall not argue or engage in heated discussions in the presence of the child.

13. Neither party shall engage in any conduct which presents to the child a negative or hostile view of the other, nor shall they allow any third party to do or say anything that would hamper the natural love and respect of the child for the other.

14. Each parent shall encourage the child to comply with this parenting agreement and foster in the child a positive view of the other.

15. The party who has physical custody of the child should encourage, prepare and have the child available at the designated times and places so visitations occur smoothly. Likewise, the party exercising partial custody or visitation rights should encourage, prepare and return the child promptly at the designated times and places.

16. **THE PARTIES MAY DECIDE DIFFERENT TIME ARRANGEMENTS AND MAKE DECISIONS FOR THE CHILD WHENEVER THEY MUTUALLY AGREE TO DO SO. NOTHING IN THIS AGREEMENT IS UNDERSTOOD**

33

TO LIMIT OR RESTRICT THE ABILITY OF THE PARTIES TO MUTUALLY AGREE ON ALTERNATIVE PARENTING ARRANGEMENTS. IF FOR ANY REASON THE PARTIES CANNOT AGREE, THE TERMS OF THE CONSENT AGREEMENT WILL BE FOLLOWED.

17. **ALL HOLIDAY SCHEDULES SHALL SUPERSEDE ANY OTHER TIME ARRANGEMENT UNLESS THE PARTIES MUTUALLY AGREE TO DO OTHERWISE.**

18. **VIOLATION OF THIS ORDER BY ANY PERSON MAY RESULT IN CIVIL AND CRIMINAL PENALTIES, INCLUDING PROSECUTION PURSUANT TO SECTION 2904 OF THE PENNSYLVANIA CRIMES CODE, INTERFERENCE WITH CUSTODY OF CHILDREN.**

19. Jurisdiction of the child shall remain with the Court of Common Pleas of Blair County, Pennsylvania, unless or until jurisdiction would change under the Uniform Child Custody Jurisdiction Act.

20. No party shall relocate the children unless every individual who has custody rights consents to the proposed relocation, or the court approves the relocation. Any party who desires to relocate with the children shall first notify every other individual who has custody rights. The party who desires to relocate with the children must also comply with 23 Pa.C.S. 5337

34

et seq. (A copy of this statute is available in the Blair County Custody Office).

In closing, we ask the parents to rededicate to A.M.S.'s best interest under the arrangement which we are presently ordering. We hope this will give you some relief. We do believe that the removal of distancing in time of the events of the past year (including this litigation) may be an assist to get this back on a more even keel. Your ability to communicate and to "correct" some of your behaviors will be critical to whether a fifty-fifty arrangement can succeed for any significant period of time into the future. We wish you well in that regard as we believe both of you in the most important testimony which you have repeated consistently – namely, that A.M.S. is essentially doing well both in school and his activities. It would be a shame, albeit it may be necessary to conclude an arrangement where that is the reality based on your own problems of communication and control rather than A.M.S.'s needs. We wish you every success in making the necessary adjustments.

BY THE COURT:

_____ J.

FILED: January 30, 2014
ajh

35

IN THE COURT OF COMMON PLEAS OF BLAIR COUNTY, PENNSYLVANIA

M.s.       Plaintiff       :
:
:
v.                    :NO. 2006 GN 2267
:
V.M.F.       Defendant       :

HONORABLE HIRAM A. CARPENTER, III    SENIOR JUDGE

TERRESSA E. GEORGE, ESQUIRE         COUNSEL FOR PLAINTIFF

THOMAS DICKEY, ESQUIRE             COUNSEL FOR DEFENDANT

## OPINION AND ORDER

This matter comes before the Court for resolution of the existing issues relating to the custody of these parent's only child, A.M.S., born May 2004. Hearings were held in the matter commencing October 30, 2015, which afforded both parents the opportunity to testify to their positions regarding the primary custody of A.M.S. Next, A.M.S. was then interviewed by the Court several months before the conclusion of the school year which formally closed proceedings. After the conclusion of these proceedings, the parties were then afforded several months to determine whether or not a further agreement could be reached between them which would have eliminated the need for the Court to make a determination over the issue of primary custody. In that regard, the parties had agreed from

#67

the outset that there would be no change in A.M.S.'s primary custody prior to the end of the school year which occurred in June 2016. In the interim, the status quo was maintained by that agreement. With the conclusion of the school year and no agreement now having been reached, the record is presently closed and the matter is ripe for determination before the Court.

As the record will reflect, this Court has previously authored a thirty-five page opinion regarding the custody of A.M.S. . That opinion was filed on January 30, 2014. We incorporate that opinion in its entirety in the opinion we author presently noting that with respect to many of the matters discussed in our January 30, 2014 opinion our views remain unchanged.

Essentially, we continue to believe that each of these parents have performed remarkably and steadfastly with respect to A.M.S.. It was primarily that reason, taken together with A.M.S.'s consistently solid development during their fifty-fifty shared custody arrangement, that convinced this Court at the time of our earlier writing that some continuation of the party's fifty-fifty custody relationship should be maintained.

In that regard, we were taking what for this Court was almost an unprecedented step – namely, maintaining a fifty-fifty relationship where one of the parents (the Mother) was firmly

2

opposed and the other parent (the Father) also had questions about the viability of the arrangement. Knowing this, we invited the parties back before the Court should our tweak of their fifty-fifty arrangement (which provided for fewer transfers) prove unsuccessful.

Regrettably, the parties are now back before the Court with that arrangement having proved unsuccessful in the view of both. By hearing the matter again in an additional full evidentiary hearing commencing less than two years after our January 30, 2014 evidentiary hearing we honor our pledge to the parties that they could (and should) return should the arrangement prove unsuccessful.

While the pretrial narratives of the parties emphasize that neither of the parties was "happy" with the fifty-fifty arrangement we acknowledge that (in our view) as we heard the Father's testimony there appeared to still be a question in his mind whether a fifty-fifty might actually still be best for A.M.S. . Because we have that perception we will address the issue of a further continuation of the fifty-fifty relationship first.

As the parents (hopefully) read again our January 30, 2014 opinion it should become apparent to them that while we believed a continuation of the fifty-fifty relationship was best we expressed doubts several times in our opinion whether this would

3

prove successful. Our caution that the fifty-fifty might prove unsuccessful was based on the simple reality that fifty-fifty relationships are rarely able to be maintained forever. We spoke to this at length in our earlier opinion and will not repeat everything we wrote earlier. The eventual "termination" of fifty-fifty relationships for various reasons remains the reality for most cases. As we noted in our earlier opinion, however, this case did not (again in our view) fit the mold of "most" cases.

As we offered in our January 2014 opinion at pages 7-8 we outlined in detail our experience with fifty-fifty relationships and the types of events which typically precipitate a termination of the arrangement while noting at page eight of our opinion that this case fit none of the traditional categories familiar to our experience. In fact, we viewed the problem with the fifty-fifty relationship which brought you before the Court was a problem totally between you while the relationship itself was still most beneficial to A.M.S. . Unfortunately, that is no longer our view. In fact, the problems between you have now reached a point where we are satisfied that you can no longer co-parent in a fifty-fifty relationship successfully.

We base this on several fundamental realities. First, our belief that the frequent transfers (almost daily) which were occurring prior to our 2014 opinion would improve communication

4

has proven to be incorrect. The truth is that the band-aid which we put by extending the periods to one week on/one week off throughout the year bought only a few months of peace in that by mid-2014 both sides were filing multiple petitions over issues where even a modest ability to communicate would have allowed for agreement. Meanwhile, the tensions between you as parents (and the Father's new wife) escalated to a point where police involvement occurred with a resulting increase in tensions. As A.M.s. approaches his teenage years, none of this has even the possibility of healthy parenting. While A.M.s. appears to still be doing well according to all accounts, what we have presently is a time bomb where his development into his teenage years seems almost certain to trigger a reaction one way or another. Worse, many of the advantages which we had in 2014 and especially the fact you both resided in the Tyrone School District no longer exists. In the summer of 2015, in fact, the Father moved into the Altoona School District. With that move, a choice of school districts is inevitable due to the fact that the transport either way by whichever parent was "a twenty minute drive away" is impractical generally and made even more impractical because of A.M.s.'s participation in sports throughout the school involving numerous evenings due to the wrestling schedule and his participation in various clubs. Inevitably, these problems will only escalate as A.M.s. gets

5

older. For all of these reasons, we believe the parents are correct in returning to the Court for resolution of the issue of primary residential custody. We also believe the Father's reluctance (as we perceive it) to commit fully to the designation of a primary residential custodian is no longer the appropriate view. Simply put, the history since January 2014 taken in total convinces us this is simply not going to work.

As always, our paramount concern in a case whether it involves custody or visitation is the best interest and permanent welfare of the children. Commonwealth ex rel Pierce v. Pierce, 493 Pa. 292, 426 A. 2d 555 (1981). All other considerations are deemed subordinate to the child's physical, intellectual, moral and spiritual well being. In the interest of Tremayne Quame Idress R., 429 A.2d 40, 43 (1981). Parents do not have a property right in their children. Whatever claim they may make for either custody or visitation rights is to be tested by what is in the best interest of the children. See generally Commonwealth ex rel Children's Aid Society v. Gard, 66 A.2d 300 (1949). A custody decree is not meant to punish a parent or anyone else. Its only purpose is to help the child. In Re: Custody of Temos, 450 A.2d 111 (1982). The clear trend has been to abolish presumptions in custody disputes. In children custody cases, the Court must continually hew to the polestar of a child's best interest eschewing presumption and

6

surmise. Morris v. Morris, 412 A.2d 139, 141 (1979). The Court should avoid mechanical determinations and focus its analysis on a close scrutiny of all particular facts relevant to determining the child's best interest. In Re: Custody of Hernandez, 376 A.2d 648, 653 (1977). Further, the ability to care for a child is to be determined as of the time of the custody hearing, not as of an earlier time. In Custody of Frank, 423 A.2d 1229 (1980). Decisions must be made on the basis of current facts and not the past conduct of the parties. In Re: Leskovich, 385 A.2d 373 (1978). The primary concern in custody matters lies not with the past but with the present and future. Hooks v. Ellerbe, 390 A.2d 791 (1978). Facts at the time of hearing are the foundation for the determination of the Court. Augustine v. Augustine, 324 A.2d 477 (1974). At hearing, each parent shares the burden of proving by a preponderance of the evidence that an award of custody to him or her would serve the best interest of the child. Ramos v. Rios, 378 A.2d 400 (1977). Continuity and stability are important elements in a young child's emotional development. Commonwealth ex rel Jordan v. Jordan, 448 A.2d 1113 (1982).

The principles enunciated above are time honored in Pennsylvania law. More recently, however, as a result of the Pennsylvania's adoption of the new Child Custody Act at 23 Pa.C.S.A. §5328(a), that act directs that when a party files a

7

petition for modification of a custody order, the trial court must perform a "best interest of the child" analysis considering all of the Section 5328(a) factors. Those factors are as follows:

1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

3) The parental duties performed by each party on behalf of the child.

4) The need for stability and continuity in the child's education, family life and community life.

5) The availability of extended family.

6) The child's sibling relationships.

7) The well-reasoned preference of the child, based on the child's maturity and judgment.

8) The attempts of a parent to turn the child against other parent, except in case of domestic violence where reasonable safety measures are necessary to protect the child from harm.

9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

10) Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.

11) The proximity of the residences of the parties.

8

12) Each party's ability to care for the child or ability to make appropriate child-care arrangements.

13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness of inability to cooperate with that party.

14) The history of drug or alcohol abuse of a party or member of a party's household.

15) The mental and physical condition of a party or member of a party's household.

16) Any other relevant factor.

As the language of the Act suggests, these factors are not the only factors a Court may consider. However, they are to be included as part of the analysis.

## DISCUSSION

With the determination made that it is necessary in A.M.S.'s best interest to determine a primary residential custodian, we turn to the statutory factors as the primary format for this opinion and order.

**1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.**

At the time of our January 30, 2014 writing we did not see this as a major issue in the case. That opinion on our part was solidly based on the remarkable achievement by these parents,

9

who had little or no relationship before A.M.S.'s birth, in maintaining a fifty-fifty custody arrangement for ten years without much need for outside intervention. Unfortunately, since our order of January 30, 2014 problems have become more frequent because of fundamental communication and control issues and have, in fact, increased difficulties. Issues such as A.M.S.'s possession and use of a cell phone which might have provided some relief during the parents periods of separation from A.M.S. have (instead) become a source of difficulty. In this regard, we reference our January 30, 2014 Opinion at page twelve as follows:

> Our issue is far more subtle than whether these parties would follow a court order. We believe they can pass that test. The greater question is whether these parents can achieve flexibility and resolve communication and control issues sufficiently for the fifty-fifty arrangement to go on much longer. For reasons which we will state later in this Opinion we believe this can and should be attempted in A.M.S.'s best interest.

The above represented our view of the party's situation relative to encouraging and permitting future contact. At this juncture they have failed that test. In fact, they have not been able to achieve flexibility and resolve their control and communication issues sufficiently for us to believe with any confidence that flexibility will ever occur.

10

That said, the issue favors neither party to such an extent that it would provide a sound basis (in itself) to favor one party or the other. There are simply too many complaints each way. This issue, however, does resonate as one of the primary reasons why as A.M.S. enters his teenage years the fifty-fifty relationship is no longer appropriate. A.M.S.'s life into these next few years will require a maximum of flexibility as opposed to those years when he was far more dependent on each of his parents to make the decisions during their periods of custody.

**2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**

Issues of abuse have never been present in this case. There has never been an allegation of abuse against anyone past or present. Rather, what we have seen over the intervening two years is a continuation of the poor relationship which exists between the Father and the Mother as well as the Father's new wife            . This has led to police involvement on at least two occasions. Significantly, neither of these occasions involved A.M.S. directly although he was present (obviously) at the wrestling banquet where separate confrontations apparently occurred between the Mother and the Father and the Mother and the step-mother. While these were certainly unhealthy for A.M.S. , they were far more indicative of the need to terminate

11

the fifty-fifty relationship than in addressing the question of who specifically should be the primary residential custodian. Simply put, they are demonstrative (very) of the reasons that bring us here. Beyond that conclusion, however, the events do little to decide an issue such as primary residential custody. Indeed, to decide primary custody based on this type of isolated occurrence would be a poor exercise of our discretion and extremely unfair to A.M.S. In fact, to the extent they represent "abuse" issues or simply the poor relationships existing between these respective individuals they do not serve as a primary basis for our determination of primary residential custody.

**3)   The parental duties performed by each party on behalf of the child.**

This issue continues to be a strength for both parties. Each of the parents participates in all aspects of A.M.S.'s life. That participation, in fact, was so strong by both of these parents that it gave us pause at the time of our earlier opinion (See page 13 of our Opinion and Order of January 30, 2014) in terminating the fifty-fifty relationship. Beyond that, we do not view either parent more positively than the other in terms of their willingness to perform parental duties. While their priorities with respect to A.M.S.'s involvement (especially in sports) may be somewhat different, we have no

12

doubt that either parent would see that A.M.S. was actively involved in those activities in which he wishes to participate.

**4)    The need for stability and continuity in the child's education, family life and community life.**

This is probably the most important factor in the case as it clearly represents the area where the most change has occurred since our January 2014 Opinion. As noted previously, at the time of our earlier opinion these parties lived blocks from each other. Now, due to the Father's move to the Altoona School District not only is there a twenty minute drive involved between their homes but we confront a situation where if the Father is designated the primary custodial parent a change in A.M.S.'s school district to Altoona becomes a veritable certainty. In fact, if that change did not occur A.M.S. would be subjected to numerous daily trips back and forth from Tyrone to the Father's residence, which would require A.M.S. to get up earlier to go to school while (inevitably) putting him at a distance from his friends and social life with his fellow students. For these reasons, the Mother would offer more stability as the primary residential custodian if A.M.S. is to remain where he has always been at Tyrone.

Because of the reality that A.M.S. would be transferred to the Altoona Area School District or be exposed to significant back and forth to Tyrone if the Father is primary residential

13

custodian it becomes necessary to ask a very important question - namely, is A.M.S. better served in the Altoona Area School District than he is in Tyrone? Considering that question, the answer is clearly no. In fact, A.M.S. is better served remaining in the Tyrone Area School District for numerous reasons. First, and foremost, he is clearly succeeding there. That is the testimony of everyone. To relocate a child away from his well established relationships (according to A.M.S., his best friends are in Tyrone) and a school district where he is successful (according to everyone) requires reasons. Simply put, from the standpoint of his development those reasons do not exist. In fact, A.M.S. residing in the Altoona School District and attending there would fundamentally change everything that he has experienced to this point. While A.M.S. is certainly flexible, this factor is extremely important to us and to A.M.S. . In that important sense, this opinion is very different from the one we entered earlier on January 30, 2014 where we offered the following on the issue of stability and continuity:

> We need to provide maximum stability and continuity for A.M.S. . We are assisted in that by the fact these parents live only four blocks apart so nothing we do will require a change in school districts or activities. We believe we can enter an order that will satisfy A.M.S.'s need for stability and continuity while reducing some of the parental tensions which will

14

ultimately (if they have not done so
already) affect him.
(See Opinion and Order of January 30, 2014, pg. 15).

What was true then is no longer true. This case has, to some extent, become a relocation case. Given A.M.S.'s familiarity with the Tyrone School District, his friendships in the Tyrone area, and his successes to this point it is clear that this factor strongly favors A.M.S. being placed in the primary custody of his Mother where that stability exists.

5) **The availability of extended family.**

While there was testimony as to some changes, both the testimony and our interview with A.M.S. suggest that these relationships all continue to be positive. This is not a major factor in our decision.

6) **The child's sibling relationships.**

At the time of our earlier hearing, as part of the Mother's case for designating her as the primary residential custodian she emphasized that this would place all three of her children – Son, daughter , and A.M.S. – under one roof. Although Son and daughter have other fathers, the Mother was at the time of our earlier writing and continues to be their primary residential custodian. The joinder of siblings becomes an important consideration when considered in the light of the fact that the Father has moved to Altoona which places additional separation between these siblings than existed when they were four blocks

15

apart. As occurred at our earlier proceeding, the Mother again offered her son's testimony in support of these relationships. We (again) declined to hear him based on Son's minority. In that regard, we are also guided by the fact the Father made no claim these relationships were not healthy. As we noted previously, if we award the Mother primary custody this would be one of the positives. (See Opinion and Order of January 30, 2014, pg. 17).

7) **The well-reasoned preference of the child, based on the child's maturity and judgment.**

Once again, as we had at the time of our earlier opinion, we did interview A.M.S. Obviously, having had the opportunity to interview him with respect to our January 30, 2014 Opinion, we were curious as to his development. We were also interested in assessing how the parents' ongoing difficulties (clear to everyone) might have impacted A.M.S. Further, knowing that A.M.S. was entering counseling (directed by the Father) at the conclusion of our earlier proceedings we were anxious to assess this as well.

In the interest of completeness, having raised the issue of the counseling, we note the counseling did not appear to be indicated after it was commenced and it was terminated by the counselor (Peggy Nadenick). The counselor did not testify at our proceeding or submit any report.

16

Our interview with A.M.S. was significant in two respects. Although the Mother had indicated she believed A.M.S. preferred her as the primary residential custodial parent, he did not make any attempt to choose between his parents. Instead, when we asked him generally whether there was anything we (the Court) could do to assist him he suggested that "we help his parents get along better" as his recommendation. A response of this nature suggests several things. First, that A.M.S. is very aware of the extent of the difficulties between his parents. Second, that they have begun to affect him to the extent that he would make such a comment to the Court. Third, that A.M.S. is thinking about his situation in a mature fashion and clearly recognizes that his ability to remain in a "fifty-fifty custodial relationship" is at issue.

Beyond that, while choosing neither parent specifically A.M.S. did indicate a clear preference for remaining in the Tyrone School District. Obviously, this is extremely significant to our determination. Certainly A.M.S. can hardly be blamed for taking that view. He was clear that his friends and activities are primarily Tyrone based. His success (again according to everyone) in Tyrone as opposed to marching off into the wild card which the Altoona School District would inevitably represent again demonstrates maturity. In this regard, A.M.S.

17

did impress us in terms of his ability to provide something meaningful to this deliberation.

8) **The attempts of a parent to turn the child against other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

Although the difficulties between these parents have increased in terms of the tension level, the issue of alienation is not a point of emphasis for either. There was no claim that either parent has attempted to turn A.M.S. against the other parent or win favor with him where custody was concerned. As we noted previously, the Father continues to believe his work ethic demonstrated through his long term employment with Houtzdale State Correctional Institution as well as his wife's military background provides a disciplining atmosphere to A.M.S. which is positive. The Father's role as coach and mentor of A.M.S. and his relation with him in those regards also remains clearly established.

For her part, the Mother's situation remains remarkably unchanged. The Mother continues to tailor her work to meet the needs of her three children. She also continues to receive child support from all three fathers as an additional source of income.

For his part, A.M.S. seems content in both households and speaks positively about both of them.

18

9) **Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.**

At the time of our earlier writing it was not clear to us which of these parents was <u>more</u> <u>likely</u> to maintain a loving, stable, consistent and nurturing relationship with A.M.S. . We could offer little more than commending each of them for doing a (mostly) good job to this point.

While we retain that view where each of the parents is concerned individually, we no longer question (as we did at length in our earlier opinion) (See pgs. 20-22 of the January 30, 2014 Opinion and Order) "what is our alternative". In fact, we are now of the view that an alternative is necessary.

As this opinion developed, it became clear that the Mother's household is favored over the Father's for reasons of stability and continuity. This view, however, is <u>not</u> <u>based</u> on the stability and continuity within either household. Rather, it has to do with A.M.S.'s success to this point in the Tyrone School District and the risk of changing what has been a successful formula for him. To take such a risk, we would have to be satisfied there were substantial reasons for doing so. Simply put, in his presentation in terms of primary custody, the Father has failed to convince us relative to this issue that, in fact, his household is superior to the Mother's.

19

We have now held the hearing which we discussed in our earlier Opinion of January 30, 2014 (at page 24) where we would emphasize "the comparative strengths and weaknesses of each household" to determine any potential superiority. In fact, at this juncture we believe neither of the households has been established as sufficiently superior to justify finding an award of custody based on this factor one way or the other. In fact, both (in and of themselves) are stable, loving, consistent, and nurturing environments. As a result, this factor is not a basis to determine the issue of primary residential custody one way or the other.

**10) Which party is more likely to attend to the daily, physical, emotional, developmental, educational and special needs of the child.**

As we opined at the time of our earlier opinion of January 2014, everything we have said on the preceding factor would apply with this factor as well.

**11) The proximity of the residences of the parties.**

This strength in the case, of course, no longer exists with the Father's move to Altoona. In fact, there would be changes in A.M.S.'s school district, activity structure, and social network which would inevitably result from placing A.M.S. with his Father. Simply put, we would have to have substantial reasons to make this change.

20

12) **Each parent's ability to care for the child or ability to make appropriate child-care arrangements.**

This is not an especially important issue in this case. As we observed previously, both parents have the ability to care for A.M.s. and make considerable sacrifices to do so. We have a positive view of both parent's ability to make appropriate child care arrangements when those are required.

13) **The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.**

The level of conflict in this case is, of course, a primary issue. In fact, the communication problems and control issues have reached the point in our judgment where the fifty-fifty relationship should not continue and, in fact, we should designate one of the parents as the primary residential custodian.

14) **The history of drug or alcohol abuse of a party or member of a party's household.**

This is not an issue in the case.

15) **The mental and physical condition of a party or member of a party's household.**

This is not an issue in the case.

## CONCLUSION

Having concluded our discussion of the statutory factors, it seems clear based on our conclusions that the primary

21

2. The residential custody of the minor child shall be with the Mother, with the Father having periods of partial custody as follows:

    a. During the school year, A.M.s. shall be with the Father on an every other weekend basis from Friday after school (or sports if he is practicing that day) until Sunday at 7:00 p.m.

    b. During the summer, A.M.s. shall be with his parents on the same week on/week off basis existing presently with Sunday transfers. This schedule shall commence the first Sunday after school ends at 5:00 p.m. until 5:00 p.m. the following Sunday and with this alternating schedule ending timed so that A.M.s. will be at his Mother's at least one full week prior to school starting.

    c. We affirm the holiday schedule in all of its particulars.

    d. We direct the parties to arrange one evening weekly where A.M.s. is with his Father for some period of custody which would be at least two hours in length and no more than four hours depending on A.M.s.'s schedule and the Father's work availability. Because we believe that the

23

Father's work schedule rotates, this designated weekly evening would need to rotate based on the Father's schedule (and probably A. M.s.'s ) it could coincide as well.  We leave this to the parties to accomplish consistent with A.M.s.'s best interest and the spirit of this order.  We remain available to assist with further definition if the parties are unable to reach agreement.

In closing, we ask the parents to rededicate again to A.M.s.'s best interests under this Order.  Specifically, we ask the Father to continue to involve with A.M.s.'s sports and activities as he has in the past and which he has the clear ability to do notwithstanding anything in this Order. Specifically, we ask the Mother to allow open phone contact and additional periods to A.M.s. with the Father beyond this Order as may appear appropriate to his maintenance of that very important relationship.

Beyond that, be assured that this Court takes no pleasure in this Opinion and the decision that your situation has required. Our respect for both of you remains considerable. Unfortunately, as has been repeatedly pointed out, the problem here is the parents and not A.M.s. which leads to your present reality.  Remember going forward that in most situations and

24

especially in your situation the best parent is two parents.  We ask you to act accordingly on A.M.S.'s behalf.

BY THE COURT:

_____ S.J.

FILED: _August 8, 2016_
ajh

25